# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-00-00244-CR

**The State of Texas, Appellant**

**v.**

**John Thomas Daly, Appellee**

### FROM THE COUNTY COURT OF LLANO COUNTY
### NO. 11,147, HONORABLE J. P. DODGEN, JUDGE PRESIDING

The State appeals the county court's order granting appellee John Thomas Daly's motion to suppress evidence. *See* Tex. Code Crim. Proc. Ann. art. 44.01(a)(5) (West Supp. 2000). The underlying prosecution is for possession of less than two ounces of marihuana. *See* Tex. Health & Safety Code Ann. § 481.121(a), (b)(1) (West Supp. 2000). We will affirm the order.

On April 14, 1999, Daly was driving through the Hill Country with his wife and one-year-old daughter, looking at the wildflowers. At 12:30 that afternoon, they were stopped on Highway 29 about four miles west of Llano by Robert Byler, a San Saba police officer permanently assigned to the 33rd Judicial District Narcotics Enforcement Team. Officer Byler, who was patrolling the highway in a marked vehicle, testified that he stopped Daly after seeing him make a turn without signaling. Daly and his wife testified that Daly did signal the turn.

The roadside encounter following the stop was videotaped by a camera mounted in Byler's patrol vehicle. The videotape was introduced in evidence, and we have watched it during our review of the record. The officer was dressed in his "NET uniform": black shirt, black utility pants, and black combat-style boots. He did not carry his pistol in the usual Sam Browne belt, but instead had it strapped to his thigh. Byler introduced himself to Daly as being with "State narcotics." Byler explained to Daly why he had been stopped, took Daly's driver's license, and returned to his patrol vehicle, leaving Daly standing at the rear of his car. A radioed check disclosed no outstanding warrants for Daly. Byler returned to Daly and issued him a warning for failing to signal his turn.[1]

At this point, there is a conflict between the testimony at the suppression hearing and the events shown on the videotape. Byler testified that after issuing the warning, he returned Daly's driver's license and told him he was free to go. Daly testified that he did not remember Byler returning his license and that Byler did not tell him he could leave. The videotape shows that the officer did return Daly's driver's license, but that he did not tell Daly he was free to go. Instead, Byler asked Daly if he would mind answering some questions.[2] Daly replied that he did not mind. At the hearing, Daly explained that he believed that he was in no position to ignore

---

[1] Although Byler was ostensibly on traffic patrol, he testified that he was not provided a book of "regular citations," and carried only warning tickets. It seems apparent from the record that Byler's primary interest was narcotics interdiction. On the videotape, Byler tells Daly that the improper turn "gave me a reason to stop you."

[2] Byler testified that the purpose of the questioning was to develop reasonable suspicion of a narcotics violation. According to the officer, "We're trained to go through conversations or look —while you're standing at the window look for any paraphernalia or anything. That way you can develop reasonable suspicion before you ask for consent to search."

Byler's questions and walk away "unless he gave me my license and that piece of paper and said, 'You may go.'" Daly added, "I never heard or felt that I was free to go. . . . I wouldn't leave until the officer would say, 'Okay. You can go,' you know. And I never heard that. Believe me, I would have gotten in my car and gone." Daly also said that Byler's appearance that afternoon "was downright scary to me," citing the officer's all-black uniform, sunglasses, and low-slung pistol.

Byler began his questioning by asking Daly if he had ever been arrested.[3] Daly admitted that he had. Thereafter, in response to a series of questions by the officer, Daly revealed that he had been arrested for driving while intoxicated and for possession of marihuana, the latter offense occurring in the 1970's. After asking Daly for other details regarding the marihuana possession, Byler inquired when Daly had last smoked marihuana. Daly told the officer that it had been several weeks earlier. Byler asked if Daly "had any pot on [him]." Daly said he did not. The officer then asked if Daly had any "roaches" (butts of smoked marihuana cigarettes) in the car. Daly told Byler that there was a roach under the floor mat on the driver's side of the car.

Byler frisked Daly, asked Daly's wife and child to get out of the car, and retrieved the remains of the marihuana cigarette. Byler then asked for and received Daly's permission to search the car. The officer found a pill in the glove compartment. Daly testified that this was an analgesic for which he had a prescription.

---

[3] The officer testified that this was a "standard question" he was taught to ask at "interdiction schools." Byler stated, "I usually ask it, no matter what."

Daly's motion to suppress challenged the legality of both the initial stop and the subsequent questioning and search.[4] The county court granted the motion in a written order. In the order, the court expressly declined to rule on the propriety of the stop, citing the "conflicting evidence." Assuming the propriety of the stop, the court went on to find that Daly was lawfully detained while Byler checked for outstanding warrants and issued the written warning. The court concluded, however, that Daly was unlawfully detained thereafter, and that his consent to the questioning and search was involuntary.

> An "average" citizen (definition being a citizen not fully versed in applicable law and one not accustomed to questioning by law officers) will be marginally intimidated by a uniformed officer. They normally would not know that they are "free to go" when the cause of detention is completed.
>
> Notwithstanding that the defendant had a prior criminal history, he obviously did not know he was no longer being detained and was "free to go." It further is the opinion of the court that the officer's uniform (described during testimony as a "SWAT uniform and only seen on TV") was intimidating to the defendant to the point that he felt uncomfortable and therefore an element that led him to feel compelled to not leave. Questioning for the purpose of developing reasonable suspicion was congenial and appropriate in the opinion of the court, although the detention after conclusion of the traffic stop is another question.
>
> The court rules that consent to questioning and search of the vehicle were involuntary, based on the aforementioned reasons, all evidence is suppressed subsequent to issuance of the traffic citation, and the Motion to Suppress is GRANTED in its entirety.

---

[4] The motion cited article 38.23, the Texas exclusionary rule, but did not specify the constitutional provision or law allegedly violated. *See* Tex. Code Crim. Proc. Ann. art. 38.23 (West Supp. 2000). The State did not challenge the adequacy of the motion. It was Daly's contention at the hearing that Byler's actions violated the federal and state constitutional guarantees against unreasonable searches and seizures. *See* U. S. Const. amend. IV; Tex. Const. art. I, § 9.

The standard of review on an appeal from an order granting or denying a motion to suppress evidence is as follows:

> [A]s a general rule, the appellate courts . . . should afford almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor. The appellate courts . . . should afford the same amount of deference to trial courts' rulings on "application of law to fact questions," also known as "mixed questions of law and fact," if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. The appellate courts may review *de novo* "mixed questions of law and fact" not falling within this category.

*Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997) (citations omitted).

A traffic stop is a Fourth Amendment seizure analogous to a temporary detention. *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). The detention may last no longer than is necessary to effectuate the purpose of the stop. *Florida v. Royer*, 460 U.S. 491, 500 (1983). A detention becomes unreasonable when it is not reasonably related in scope to the circumstances which justified the detention in the first place. *Davis v. State*, 947 S.W.2d 240, 244 (Tex. Crim. App. 1997).

Daly was stopped solely on the basis of the observed traffic violation. There is no evidence of any suspicious behavior or incriminating circumstance arising after the stop that would have warranted the officer in detaining Daly beyond the time needed to issue the warning ticket. Indeed, Byler acknowledged at the hearing that after the ticket was issued, "Our business was concluded." Nevertheless, Byler thereafter sought to question Daly for the purpose of "developing reasonable suspicion." But the existence of reasonable suspicion must *precede* a

detention; a detention that is not based on reasonable suspicion is unlawful. *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *Davis v. State*, 829 S.W.2d 218, 221 (Tex. Crim. App. 1992). On this record, there was no basis for continuing to detain Daly after the traffic warning was issued.

The State argues that Daly was not detained beyond the issuance of the warning ticket. Instead, the State contends Daly voluntarily remained at the scene to answer the officer's questions.

The Fourth Amendment does not proscribe voluntary cooperation. *Florida v. Bostick*, 501 U.S. 429, 439 (1991). A police officer may approach a citizen without probable cause or reasonable suspicion to ask questions or even to request a search. *Florida v. Royer*, 460 U.S. 491, 497-98 (1983); *Johnson v. State*, 912 S.W.2d 227, 235 (Tex. Crim. App. 1995). "When officers have no basis for suspecting a particular individual, they may generally ask questions of that individual . . . as long as the police do not convey a message that compliance with their requests is required." *Bostick*, 501 U.S. at 435. As long as the citizen to whom the officer puts the questions remains free to disregard the questions and walk away, neither the Fourth Amendment nor article I, section 9 is implicated. *Royer*, 912 U.S. at 497-98; *Johnson*, 912 S.W.2d at 235.

Whether a person's consent was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). The State must show by clear and convincing evidence that consent was voluntarily given. *State v. Ibarra*, 953 S.W.2d

6

242, 245 (Tex. Crim. App. 1997). "'Consent' that is the product of official intimidation or harassment is not consent at all." *Bostick*, 501 U.S. at 438.

The county court concluded that Daly did not voluntarily consent to Byler's questioning or to the search of his car on the basis of two findings. First, the court found that an average citizen will feel "marginally intimidated" by a uniformed officer, and that Daly himself felt uncomfortable in the presence of Byler's SWAT-style uniform. "[M]ost confrontations with the police are uncomfortable —given the implicit difficulty in refusing any request from a peace officer who stands cloaked in the authority of law enforcement . . . ." *Carmouche v. State* 10 S.W.3d 323, 333 (Tex. Crim. App. 2000). "But the Constitution does not guarantee freedom from discomfort. And the test is not whether a timid person would feel free to terminate the interview. Instead, the [courts use] a 'reasonable person' standard." *State v. Velasquez*, 994 S.W.2d 676, 679 (Tex. Crim. App. 1999). The Constitution "presumes that an actor is invested with a vibrant sense of his own constitutional rights and will assert those rights when they are implicated." *Carmouche*, 10 S.W.3d at 333. The question is not whether Daly felt uncomfortable telling Byler he did not want to answer the officer's questions, but whether Byler, by word or deed, conveyed the message that compliance with his request was required.

The county court also found that an average citizen will not know that he is free to go when the cause of a detention is completed, and that Daly himself did not know that he was free to leave after the warning ticket was issued. Such knowledge was not essential to a finding that Daly voluntarily consented to answer Byler's questions. Voluntary consent is not equivalent to a knowing waiver. "[W]e cannot accept the position . . . that proof of knowledge of the right

7

to refuse consent is a necessary prerequisite to demonstrating a 'voluntary' consent." *Schneckloth*, 412 U.S. at 232-33. "[W]hile the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." *Schneckloth*, 412 U.S. at 249; *see also Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996) (Fourth Amendment does not require officer to inform detainee that he is free to go before consent to search may be deemed voluntary). The dispositive question is not whether Daly knew he had the right to refuse to answer Byler's questions, but whether his agreement to answer the questions was the result of duress or coercion, either express or implied. *Schneckloth*, 412 U.S. at 248.

While neither Daly's feeling of discomfort nor his lack of knowledge of his rights is dispositive, both are circumstances that may be considered in determining whether a reasonable person in Daly's situation would have understood that he could ignore the officer, return to his car, and drive away. This cause does not involve a situation in which an officer approaches a person with whom he has had no previous contact and initiates a conversation. Instead, Daly had been seized by Byler within the meaning of the constitution when he was stopped for the traffic offense. Byler identified himself to Daly as "State narcotics," was driving a vehicle bearing the words "narcotics enforcement team," and had his trained narcotics-sniffing dog in the patrol vehicle. While the legal justification for the seizure ended with the issuance of the warning ticket, Daly did not know and was not told that he was free to go about his business.[5]    It is

---

[5] By finding that Daly did not know he was free to go, the county court implicitly found that Byler's testimony on this point was not credible. *See Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000). In any event, the videotape presents indisputable evidence contradicting

8

understandable that Byler did not tell Daly that he was free to go, since by his own admission the officer intended to question Daly in order to "develop reasonable suspicion" of a narcotics violation. Indeed, the videotape demonstrates that even as he was handing Daly the ticket and his driver's license, Byler was asking Daly if he would answer a few questions. A reasonable person in these circumstances would have believed that his detention continued and that compliance with the officer's request was required.

We hold that the State failed to present clear and convincing evidence that Daly voluntarily remained at the scene to answer the officer's questions. The county court properly concluded that Daly was unlawfully detained after the issuance of the warning ticket. *See California v. Hodari D.*, 499 U.S. 621, 625-26 (1991); *Johnson*, 912 S.W.2d at 235 (person seized when he yields to officer's show of authority). Daly's statements to Byler in response to the officer's questions and the evidence found in the car were the fruits of this unlawful detention.

The order suppressing evidence is affirmed.

_____

Mack Kidd, Justice

Before Justices Jones, Kidd and Yeakel

Affirmed

Filed:   December 21, 2000

_____

the officer's testimony that he told Daly he could go before questioning him. *See id.* at 332.

9

Publish