Tarita JAMES, Appellant.

v.

The STATE of Texas, State.

Nos. 2–00–392–CR, 2–00–393–CR.

Court of Appeals of Texas,
Fort Worth.

Jan. 9, 2003.

Rehearing Overruled March 13, 2003.

Campion and Campion and Alex Joseph Scarff, San Antonio, for Appellant.

Janelle M. Haverkamp, Cooke County District Attorney, and Jackson & Hagen and H.F. Rick Hagen, Denton, for Appellee.

PANEL B: HOLMAN, GARDNER, and WALKER, JJ.

## OPINION

ANNE GARDNER, Justice.

## I. INTRODUCTION

Appellant Tarita James was convicted and given two life sentences by a jury for possession of cocaine over 400 grams and possession of methamphetamine over 400 grams. Appealing both convictions, James contends in her first two points that the trial court abused its discretion in denying her motions to suppress evidence seized after her vehicle was stopped because there was no reasonable suspicion for the stop. By her third point, James contends that there was no reasonable basis for continued detention and search after the purpose of the original stop was effectuated. By her fourth point, James complains that the trial court erred in overruling her motion to suppress an oral statement. In point five, she maintains that the trial court erred in excluding co-defendant Patrice Murphy's statement against penal interest. Point six complains that the trial court erred in allowing the State to impeach James with evidence of a prior conviction for which she satisfactorily completed probation. In points seven and eight, James urges that the prosecutor's misconduct throughout the trial and in closing argument denied her a fair trial. In James's ninth point, she argues that the trial court erred by preventing the venire panel from answering proper voir dire questions. We reverse and remand this case for a new trial.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On March 25, 1998, at 1:40 a.m., Cooke County Sheriff's Deputy Bobby Faglie was on patrol when he saw a green Jeep Cherokee leave a rest stop near the 489 mile marker on northbound Interstate 35. As the Jeep entered the highway, Faglie noticed that it failed to signal. As Faglie watched, the Jeep crossed the center stripe between the northbound lanes, then veered back over the yellow stripe onto the shoulder. Faglie followed the Jeep for

approximately a half mile. Believing that the driver's faculties were impaired, he initiated a stop.

The driver, Patrice Murphy, did not have a driver's license with her and identified herself with a Cook County, Illinois, traffic citation. The Jeep was a rental vehicle rented to James, who was riding as a passenger. When Faglie inquired where they were going and where they had been, Murphy responded that they had been sleeping at the rest stop and were still groggy, and that they were going to St. Louis, Missouri, after a two-week stay in Dallas, visiting James's aunt.

Officer Faglie had Murphy exit the Jeep and asked her if the vehicle had insurance. When Murphy responded that she did not have insurance for the vehicle, Faglie went to the passenger side of the vehicle and made the same inquiry to James. She handed Faglie the rental agreement, issued in James's name from St. Louis International Airport, which showed the vehicle was due back two days before, on March 23, 1998. James told Faglie that they were in Dallas for two days and could not find her aunt's house.

Faglie determined that Murphy was not intoxicated and issued a warning citation for failure to indicate lane change and failure to maintain a single lane of traffic. He gave the warning citation to Murphy and then asked James for consent to search the vehicle; she consented both verbally and in writing.

Upon searching the vehicle, Faglie first found two purses on the center console of the Jeep. In the purses, he found a combined total of $6,636, and in James's purse he found five small bags of cocaine. Fag-

lie handcuffed James and Murphy and placed them under arrest, while his partner read James and Murphy their *Miranda* rights.

When Faglie and his partner opened the hatchback of the Jeep, they found several shopping bags and nine suitcases, seven of which contained eighty-two insulation wrapped packages totaling over four hundred pounds of ninety-one percent pure cocaine and a forty-eight percent mixture of amphetamine.[1] Murphy and James were indicted for the offenses of possession of cocaine over 400 grams and possession of amphetamines over 400 grams. James was tried separately and was found guilty and sentenced to two life sentences by a jury.[2]

## III. DISCUSSION

### A. Motions to Suppress

In her first two points, James contends that the trial court abused its discretion by denying her motion to suppress evidence seized from the vehicle because the initial stop was improperly premised upon Murphy entering the highway without signaling and failing to maintain a single lane without evidence that the movement was unsafe, and was thus an illegal traffic stop. In her third point, James argues that the trial court abused its discretion in failing to grant her motion to suppress because the continued detention after the warning citation was issued was unreasonable. In James's fourth point, she argues that the trial court should have granted the motion to suppress an unrecorded oral statement.

### 1. *Preservation of Error*

The State first argues that points one through three were not preserved for ap-

---

1. There was evidence at trial that the amount of cocaine seized would ultimately have been worth over fifteen million dollars on the street in Chicago.

2. At the time of James's trial, Patrice Murphy had not yet been tried.

pellate review because the trial court did not rule on James's October 27, 1999 motion to suppress and the defense did not request a ruling. *See* Tex.R.App. P. 33.1(a)(2)(A), (B). We disagree that the trial court did not rule on the motion to suppress as to the reasonableness of the stop. At the close of the hearing on the motions to suppress, the trial court stated:

> I think he said he stopped them because he thought they might be DWI. After he determined that they weren't DWI, and he determined they did have insurance for the vehicle, I can understand that if he thought they had been asleep, he could also take pity on the minor traffic infractions, and give them a warning ticket. *But I think he reasonably stopped them as to the way they were driving. They could have been DWI. And that's not a minor infraction.* [Emphasis supplied].

The record reflects, however, that the trial court did not expressly rule on the legality of the continued detention because it wanted the parties to brief those issues.[3] For James to demonstrate that error was preserved for appellate review, the record must show: (1) that the complaint made was by a timely filed motion stating grounds sufficient to provide notice to the trial court and, (2) that the trial court ruled on the motion either expressly or implicitly. Tex.R.App. P. 33.1(a)(1)(A), (2)(A).

■ Here, the pretrial suppression motion and hearing provided the trial court ample notice of the nature of James's complaints. While the trial court decided that it needed more time to rule on the matter, it never explicitly ruled on the motion. At trial, however, the fruits of the continued detention were presented by the State.

Every time the State raised this evidence, James's counsel consistently objected on the same grounds he raised during the suppression hearing. The trial court overruled his objections.

■ We hold that the trial court implicitly overruled the motion to suppress, as exhibited by its actions during the guilt/innocence phase of trial. *Gutierrez v. State,* 36 S.W.3d 509, 511 (Tex.Crim.App.2001) (vacating and remanding to intermediate appellate court to consider whether the trial court's ruling on a motion to suppress was implicit). While an appellate court will generally find that a trial court made an implicit ruling on an objection when the objection was brought to the trial court's attention, it will only do so when "the trial court's subsequent action clearly addressed the complaint." *State v. Kelley,* 20 S.W.3d 147, 153, n. 3 (Tex.App.—Texarkana 2000, no pet.) (considering whether trial court's ruling was implicit on a motion to suppress not explicitly ruled on). We hold that error was properly preserved as to the seizure of the contraband. We turn to the merits of James's first three points.

### 2. *Standard of Review*

■ We review a trial court's denial of a motion to suppress for abuse of discretion. *Carmouche v. State,* 10 S.W.3d 323, 327 (Tex.Crim.App.2000); *Oles v. State,* 993 S.W.2d 103, 106 (Tex.Crim.App.1999). There is an abuse of discretion when the ruling was so clearly wrong as to be outside that zone within which reasonable persons might disagree. *Cantu v. State,* 842 S.W.2d 667, 682 (Tex.Crim.App.1992), *cert. denied,* 509 U.S. 926, 113 S.Ct. 3046, 125 L.Ed.2d 731 (1993). We afford almost total deference to a trial court's determina-

---

**3.** The trial judge stated, "Any of those things y'all want me to consider, I like having cases on it and maybe a letter [ ] that outlines what

the cases are for [ ] in the next couple or three weeks...

tion of the historical facts that the record supports, especially when the trial court's fact findings are based upon an evaluation of credibility and demeanor. *State v. Ross*, 32 S.W.3d 853, 856 (Tex.Crim.App. 2000). We afford the same amount of deference to the trial court's rulings on mixed questions of law and fact, if the resolution of those questions turns on an evaluation of credibility and demeanor. *Carmouche*, 10 S.W.3d at 327; *Guzman v. State*, 955 S.W.2d 85, 88–89 (Tex.Crim. App.1997). We review *de novo* the trial court's application of law to those facts in the determination of reasonable suspicion and probable cause. *Carmouche*, 10 S.W.3d at 327; *Guzman*, 955 S.W.2d at 88–89.

When the trial court does not make explicit findings of historical facts, we view the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact supporting its ruling, if those findings are supported by the record. *Carmouche*, 10 S.W.3d at 327–28. In determining whether a trial court's decision is supported by the record, we generally consider only evidence adduced at the suppression hearing because the ruling was based on it rather than evidence introduced later. *Rachal v. State*, 917 S.W.2d 799, 809 (Tex.Crim.App.), *cert. denied*, 519 U.S. 1043, 117 S.Ct. 614, 136 L.Ed.2d 539 (1996).

This general rule is inapplicable where the suppression issue has been consensually relitigated by the parties during the trial on the merits. *Id.* Where the State raises the issue at trial, either without objection or with subsequent participation in the inquiry by the defense, the defendant has made an election to re-open the evidence, and consideration of the relevant trial testimony is appropriate in our review. *Id.* Because James consistently

objected at trial to the evidence at issue during the previous suppression hearing, we hold that the parties have not consensually relitigated the issue; therefore, we will limit the scope of our review of these points to the evidence presented during the suppression hearing. *McQuarters v. State*, 58 S.W.3d 250, 255 (Tex.App.—Fort Worth 2001, pet. ref'd).

### 3. *Applicable Law*

The Fourth Amendment to the United States Constitution provides, in part, that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. Warrantless searches are per se unreasonable unless they fall into a recognized exception. *Harris v. United States*, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947). The State bears the burden of establishing an exception to the warrant requirement. *Russell v. State*, 717 S.W.2d 7, 9–10 (Tex.Crim.App.1986). Consistent with the principles set forth in *Terry v. Ohio*, a police officer may stop and briefly detain a person for investigative purposes if the officer has reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks evidence rising to the level of "probable cause." 392 U.S. 1, 29, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968); *Davis v. State*, 947 S.W.2d 240, 244 (Tex. Crim.App.1997).

Reasonable suspicion exists if the officer has specific articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably suspect that a particular person has engaged in or is, or soon will be, engaging in illegal conduct. *Garcia v. State*, 43 S.W.3d 527, 530 (Tex.Crim.App. 2001). Reasonable suspicion is determined by considering the "totality of the circum-

stances." *Woods v. State,* 956 S.W.2d 33, 38 (Tex.Crim.App.1997).

### 4. *Was the stop based on reasonable suspicion?*

James argues that the initial stop was not justified because the evidence failed to show that the traffic violations Officer Faglie claimed to have seen were illegal. Specifically, James's first point argues that it is not illegal to enter onto a highway without signaling.[4] James's second point contends that crossing the middle lane was not illegal because there was no evidence that it caused danger to others.[5] James reasons that, because there was no justification for the traffic stop, the consent to search was tainted as fruit of the illegal stop and the trial court should have suppressed the evidence seized from the Jeep.

James cites *Trahan v. State,* in which the defendant gave consent for a search of his vehicle after a stop for failure to give a turn signal when exiting a freeway. 16 S.W.3d 146 (Tex.App.—Beaumont 2000, no pet.). The Beaumont Court of Appeals held that exiting a freeway without a turn signal was not a statutory violation because there was no evidence that the driver "turned" or changed lanes in order to make the exit as a prerequisite for the statutory requirement of giving a turn signal, nor was there evidence in the case that exiting the freeway under the circum-

stances was unsafe. *Id.* at 147. Therefore, the court held, there was no basis for the stop and, as the consent to the search was a fruit of the illegal stop, the evidence obtained in the search should have been suppressed. *Id.* James argues that Murphy, the driver of the Jeep, likewise did not make a "turn" upon entering the freeway, and that the stop in this case was thus illegal to the extent that it was based upon any purported traffic violation.

To support her claim that the stop could not properly have been based on Murphy's swerving over the center line and then onto the shoulder, James points out that the vehicle only traveled halfway over the center line and an unknown distance onto the shoulder and there was no evidence of other vehicles in the area so as to render Murphy's driving "unsafe." James relies upon *State v. Cerny,* in which the Corpus Christi Court of Appeals upheld the grant of a motion to suppress where the state trooper's report showed he stopped the defendant for failure to maintain a single lane although he testified the defendant only "drove to the center lane divider" three or four times and there was no evidence that the movements were made "unsafely." 28 S.W.3d 796, 799 (Tex.App.—Corpus Christi 2000, no pet.).

▇▇▇▇▇ *Trahan, Cerny,* and the cases upon which *Cerny* relied, are distinguishable.[6] In each case, the officer who made

---

4. TEX. TRANSP. CODE ANN. § 545.104(a) (Vernon 1999) ("An operator shall use the signal authorized ... to indicate an intention to turn, change lanes, or start from a parked position.").

5. TEX. TRANSP. CODE ANN. § 545.060(a) ("An operator on a roadway divided into two or more clearly marked lanes for traffic: (1) shall drive as nearly as practical entirely within a single lane; and (2) may not move from the lane unless that movement can be made safely.").

6. The court in *Cerny* relied upon *Hernandez v. State,* 983 S.W.2d 867, 871 (Tex.App.—Austin 1998, pet. ref'd) (holding that a single instance of crossing into another lane by eighteen to twenty-four inches did not constitute reasonable basis for stop when movement was not shown to be unsafe or dangerous) and *State v. Tarvin,* 972 S.W.2d 910, 912 (Tex.App.—Waco 1998, pet. ref'd) (upholding grant of motion to suppress because of illegality of stop for failure to maintain single lane based on officer's observation that auto was weaving within lane, absent evidence weaving was unsafe).

the stop specifically testified that the stop was made based only upon observation of a traffic offense. In contrast, Officer Faglie testified that, based on his observations, he believed that the driver's "driving faculties" might be impaired, as by intoxication or some other reason. There is no requirement that a traffic regulation has been or is about to be violated in order for an officer to have reasonable suspicion sufficient to justify a stop of a vehicle. *Cook v. State,* 63 S.W.3d 924, 929 (Tex.App.—Houston [14th Dist.] 2002, pet. ref'd). An officer may be justified in stopping a driver based upon a reasonable suspicion of driving while intoxicated. *Id.; Gajewski v. State,* 944 S.W.2d 450, 453 (Tex.App.—Houston [14th Dist.] 1997, no pet.); *see also McQuarters,* 58 S.W.3d at 255 (holding stop justified based on reasonable suspicion that defendant, who crossed the left lane stripe twice, was intoxicated). Erratic or unsafe driving may furnish a sufficient basis for a reasonable suspicion that the driver is intoxicated even absent evidence of violation of a specific traffic law. *Cook,* 63 S.W.3d at 929; *Fox v. State,* 900 S.W.2d 345, 347 (Tex.App.—Fort Worth 1995) (holding driver's conduct sufficient to justify stop based upon reasonable suspicion that something out of the ordinary was occurring even though no single act was illegal), *pet. dism'd, improvidently granted,* 930 S.W.2d 607 (Tex.Crim.App. 1996). We hold that Officer Faglie's testimony warranted the trial court's ruling that Faglie had reasonable suspicion that Murphy was driving while intoxicated, so that the initial stop and temporary detention were lawful. We overrule James's first and second points.

### 5. *Was the continued detention reasonable?*

In James's third point, she argues that the motion to suppress the evidence seized from the vehicle should have been granted because, after Officer Faglie issued the warning citation, there was no reasonable basis for continued detention and, for that additional reason, the subsequent search was not justified. We disagree that Officer Faglie's continued detention and search were invalid in this case.

An investigative detention may last no longer than is necessary to effectuate the purpose of the stop. *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983); *Davis,* 947 S.W.2d at 243. Once the purpose has been satisfied, the stop may not be used for an unrelated "fishing expedition." *Davis,* 947 S.W.2d at 243 (quoting *Ohio v. Robinette,* 519 U.S. 33, 41, 117 S.Ct. 417, 422, 136 L.Ed.2d 347 (1996) (Ginsburg, J., concurring)); *Simpson v. State,* 29 S.W.3d 324, 326 (Tex.App.—Houston [14th Dist.] 2000, pet ref'd). The propriety of the stop's duration is judged by assessing whether the police diligently pursued a means of investigation that was likely to dispel or confirm their suspicions quickly. *Davis,* 947 S.W.2d at 245; *Perez v. State,* 818 S.W.2d 512, 517 (Tex.App.—Houston [1st Dist.] 1991, no writ).

James relies upon *Davis,* in which the court of criminal appeals held that there was no justification for the appellant's continued detention after the reason for the initial stop was effectuated where, after the officers determined that the appellant was merely tired, rather than intoxicated, they continued to detain him merely on the suspicion that he did not look like he was on a business trip. 947 S.W.2d at 245. A canine unit was called and the narcotics dog made a positive alert at the vehicle's trunk, in which the officers found drugs. *Id.* at 241. The court of criminal appeals held that the motion to suppress should have been granted because the facts recited by the officers did not constitute rea-

sonable suspicion for the continued detention of the appellant or his vehicle. *Id.* at 246.

*Davis* is distinguishable in that the appellant in that case twice refused consent to search his vehicle. *Id.* at 241, and n. 1. In contrast, James gave both written and verbal consent to search the Jeep rented in her name. James does not contest voluntariness of the consent, nor does she contend that she was not apprised that the initial detention had ended. Rather, she argues that, under *Davis,* the officer must have discovered new or additional facts creating a reasonable basis for seeking consent to the continued detention and search. *Davis* does not stand for that proposition.

In *Ohio v. Robinette,* the United States Supreme Court held that a continued detention and search of a vehicle were reasonable when consent was given, even though no circumstances were noted that would have constituted reasonable suspicion of any further criminal activity. 519 U.S. at 39–40, 117 S.Ct. at 420–21. *Davis* and *Robinette,* when read together, mean that an officer may request consent to search a vehicle after a traffic stop and, *if such consent is refused,* the officer may not detain the occupants or vehicle further unless reasonable suspicion of some additional criminal activity exists. *Simpson,* 29 S.W.3d at 327.

It is not unreasonable *per se* to request consent after completion of a traffic stop. *Leach v. State,* 35 S.W.3d 232, 235 (Tex.App.—Austin 2000, no pet.) (holding reasonable suspicion to continue detention and search not required under *Robinette* for valid consent to search following resolution of original reason for stop); *Simpson,* 29 S.W.3d at 327; *see also Spight v. State,* 76 S.W.3d 761, 768 (Tex.App.—Houston [1st Dist.] 2002, no pet.) (holding denial of motion to suppress

based on "prolonged detention" not abuse of discretion where appellant gave consent with no indication from patrolman that compliance was required).

A police officer may approach a citizen without probable cause or even reasonable suspicion to ask questions or obtain consent to search. *Leach,* 35 S.W.3d at 235 (citing *Royer,* 460 U.S. at 497–98, 103 S.Ct. at 1324). Likewise, reasonable suspicion is not required for a police officer to request consent to search an automobile after the reason for an initial stop is concluded as long as a message is not conveyed that compliance is required. *Leach,* 35 S.W.3d at 235; *Simpson,* 29 S.W.3d at 327; *see also Spight,* 76 S.W.3d at 767 (noting constitutional proscriptions against warrantless searches and seizures do not come into play when a person gives voluntary consent); *State v. Daly,* 35 S.W.3d 237, 241 (Tex.App.—Austin 2000, no pet.) (holding that continued questioning and search after reason for initial traffic stop was concluded was invalid absent clear and convincing evidence that defendant voluntarily remained at scene).

Officer Faglie had both written and verbal consent from James, in whose name the vehicle was rented. In light of the totality of the circumstances, and absent a contention that consent was involuntary or that a reasonable person would not have felt free to leave, we conclude that the subsequent search and seizure of the contraband were not illegal. We overrule James's third point.

### 6. *Appellant's Oral Statement*

James's fourth point complains of the denial of her motion to suppress the oral statement she made to Officer Faglie during his search of the Jeep. James's counsel moved to suppress her verbal response to

an inquiry by Faglie based on article 38.22, § 3 of the Texas Code of Criminal Procedure, which provides that an oral statement of an accused is not admissible unless an electronic recording is made, including a videotape or other visual recording. TEX.CODE CRIM. PROC. ANN. art. 38.22, § 3 (Vernon Supp.2003). Faglie acknowledged no recording was made of the statement, nor was it reduced to writing. Faglie testified at the hearing on the motion to suppress that, after he obtained consent from James, he first inspected the contents of the women's purses found on the center console. In addition to discovering cash totaling over $6,000 in the purses, Faglie found five small packages of a white substance in James's purse, which was later identified as cocaine. Faglie placed both women under arrest at that time and read James her *Miranda* rights. He testified that he then asked James if there was any other contraband in the vehicle. According to Faglie, James responded that "there was no more contraband in the vehicle and what was found was for her personal use; that she was an addict."

The State introduced the statement during its case-in-chief, through the testimony of Officer Faglie. The State now concedes on appeal that the trial court erred in overruling James's motion to suppress the oral statement, but it argues that the error was harmless. First the State points out that James's statement that there was no other contraband in the Jeep actually helped her because it tended to show lack of knowledge, an essential element of the offense of possession. Second, the State argues that the error was rendered harmless when James subsequently took the stand in the guilt/innocence phase of the trial, because the statement then became admissible for impeachment purposes.

James testified at trial to her version of the events, that she and Murphy were friends, and that she trusted Murphy. James admitted the purpose of the trip was not to visit her aunt, as they had told Officer Faglie. Instead, she said, she agreed to accompany Murphy to Dallas on March 21, 2000, to pick up a BMW car that was a gift to Murphy from one of Murphy's many male friends. According to James, they drove to St. Louis, where James used her driver's license and credit card to rent the Jeep in her name because Murphy had no license. They stayed at the Red Roof Inn in Dallas, where James registered in her own name, again because Murphy had no identification. A man delivered the BMW to Murphy, but they were unable to get its title transferred because of title problems.

Murphy was to have driven James back to Chicago on Monday because she needed to get back to work, James said, but they stayed over because of the car title problems. James also testified that Murphy changed her mind about returning, so James made reservations by phone to fly back to Chicago, but did not remember the airline and did not charge tickets to her credit card. James testified she was angry because Murphy disappeared on Monday, March 24, and did not return in time to take James to the airport. When she finally returned, Murphy offered to drive her back to Chicago that night.

James testified that she did not assist in loading the luggage, but saw a man from the office at the Red Roof Inn walking toward the car to help Murphy load luggage into the Jeep. She was tired and fell asleep in the passenger seat. She did not see the bags and did not know how many bags were in the back of the vehicle. When the officers removed the suitcases during the search, she began throwing up from the shock. She denied any knowl-

edge that drugs were in the bags. On cross-examination by the State, James denied knowing what cocaine smelled like or what it would do to a person and denied being an addict.

■ Generally, oral statements by an accused as the result of a custodial interrogation are not admissible against the accused. TEX.CODE CRIM. PROC. art. 38.22, § 3(a).[7] Article 38.22 is strictly construed. *Leal v. State*, 82 S.W.3d 84, 89 (Tex.App.—San Antonio 2002, pet. ref'd). However, there are several exceptions to the rule. As applicable here, an unrecorded oral statement of a defendant is admissible on rebuttal by the State to impeach the defendant's trial testimony. TEX.CODE CRIM. PROC. ANN. art. 38.22, § 5 (Vernon 1979); *Lykins v. State*, 784 S.W.2d 32, 35–36 (Tex. Crim.App.1989); *McCoin v. State*, 56 S.W.3d 609, 617 (Tex.App.—Texarkana 2001, no pet.) (holding admission of oral statement by State on rebuttal to impeach defendant's trial testimony not error).[8]

■ Although the oral statement of James that the cocaine in her purse was hers and that she was an addict was prematurely admitted in error, we agree with the State that the error was harmless. Her subsequent testimony denying that she knew what cocaine could do or that she was an addict rendered the statement admissible for impeachment purposes. Evidence prematurely admitted in error may become admissible or be rendered harm-

less by subsequent evidence. *See, e.g., Jaramillo v. State*, 817 S.W.2d 842, 845 (Tex.App.—Fort Worth 1991, writ ref'd) (holding error in admitting extraneous acts to shore up child victim's testimony rendered harmless when credibility of victim was subsequently put in question); *see also Siqueiros v. State*, 685 S.W.2d 68, 72 (Tex.Crim.App.1985) (holding evidence of extraneous offense improperly admitted in state's case-in-chief rendered harmless when evidence subsequently became relevant on issue of identity); *Rubio v. State*, 607 S.W.2d 498, 502 (Tex.Crim.App.1980); *Poole v. State*, 974 S.W.2d 892, 898 (Tex. App.—Austin 1998, pet. ref'd) (holding premature admission of extraneous offenses rendered harmless by subsequent testimony of defendant denying offense). We overrule James's fourth point.

**B. Murphy's Statement Against Penal Interest**

By James's fifth point, she complains that the trial court abused its discretion in excluding evidence of a transcribed statement made by Patrice Murphy to Detective Ted Mordecai, a detective with the Cooke County Sheriff's Office, in the course of his investigation. Detective Mordecai testified for the State that he met the officers with the vehicle at the Sheriff's Office to assist in the investigation. On cross-examination, counsel for James questioned Detective Mordecai

---

7. The admission of an oral statement that otherwise complies with the Fifth Amendment of the United States Constitution involves no constitutional infirmity but is a matter of state statutory law. *Butler v. State*, 493 S.W.2d 190, 191 (Tex.Crim.App.1973); *see Vaughn v. State*, 931 S.W.2d 564, 566 (Tex.Crim.App. 1996).

8. Section 5 states: "Nothing in this article precludes the admission of a statement made by the accused in open court at his trial, before a grand jury, or at an examining trial

in compliance with Articles 16.03 and 16.04 of this code, or of a statement that is the res gestae of the arrest or of the offense, or of a statement that does not stem from custodial interrogation, *or of a voluntary statement, whether or not the result of custodial interrogation, that has a bearing upon the credibility of the accused as a witness,* or of any other statement that may be admissible under law." (Emphasis added). James does not contend that her oral statement was not voluntarily made.

about his interviews with James and Murphy.

Specifically, James's counsel sought to question Detective Mordecai about a statement made by Murphy, in which Murphy admitted to Mordecai that she was paid $2,000 to deliver the contraband, that she took full responsibility for the situation, that she had only "used" James to get the Jeep, and that James knew nothing about the drugs. Sustaining the State's objection, the trial court excluded Murphy's statement as inadmissible hearsay.

On appeal, as in the trial court, James contends that the statement was admissible under Texas rule of evidence 803(24) as a statement against Murphy's penal interest.[9] TEX.R. EVID. 803(24). That rule provides an exception to the hearsay rule, as follows:

> Statement Against Interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject [him] to civil or criminal liability, or to render invalid a claim by [him] against another, or to make [him] an object of hatred, ridicule, or disgrace, that a reasonable [man] in [his] position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

TEX.R. EVID. 803(24).

 We review the trial court's decision to admit or exclude evidence of a statement against penal interest under an abuse of discretion standard. *Cunningham v. State*, 877 S.W.2d 310, 313 (Tex.

Crim.App.1994) (citing *United States v. Satterfield*, 572 F.2d 687, 690 (9th Cir.), *cert. denied*, 439 U.S. 840, 99 S.Ct. 128, 58 L.Ed.2d 138 (1978)); *Fonseca v. State*, 908 S.W.2d 519, 521 (Tex.App.—San Antonio 1995, no pet.). The trial court's ruling will not be reversed as long as it is within the "zone of reasonable disagreement." *Salazar v. State*, 38 S.W.3d 141, 151 (Tex.Crim. App.), *cert. denied*, 534 U.S. 855, 122 S.Ct. 127, 128, 151 L.Ed.2d 82 (2001); *Couchman v. State*, 3 S.W.3d 155, 158 (Tex. App.—Fort Worth 1999, pet. ref'd).

 Whether a statement is admissible in accordance with Rule 803(24) requires a two-step inquiry. *Bingham v. State*, 987 S.W.2d 54, 57 (Tex.Crim.App. 1999). First, the trial court must determine whether the statement tends to expose the declarant to criminal liability. *Id.* Second, corroborating evidence must be shown that is sufficiently convincing to "clearly indicate the trustworthiness of the statement." *Id.; see also Dewberry v. State*, 4 S.W.3d 735, 751 (Tex.Crim.App. 1999), *cert. denied*, 529 U.S. 1131, 120 S.Ct. 2008, 146 L.Ed.2d 958 (2000); *Davis v. State*, 872 S.W.2d 743, 749 (Tex.Crim.App. 1994). The burden is on the party seeking admission of the statement to make this showing, and "the test is not an easy one." *Davis*, 872 S.W.2d at 747. Whether the burden has been satisfied is entrusted to the sound discretion of the trial court. *Cunningham*, 877 S.W.2d at 313.

 The proffered statement of Murphy to Detective Mordecai, taking full responsibility under the circumstances, obviously subjected her to criminal liability. The remaining issue is whether the statement was sufficiently corroborated to clearly indicate trustworthiness. *Davis*,

---

9. James's counsel preserved error by a bill of exceptions proving up the content of Murphy's statement to Detective Mordecai.

872 S.W.2d at 748. In determining whether circumstances are sufficiently corroborative, the focus is on verifying to the greatest extent possible the trustworthiness of the statement to avoid the danger of fabrication. *Id.*

 There is no determinative test for the corroboration requirement because a variety of factors may be considered in evaluating corroborating circumstances. *Cunningham*, 877 S.W.2d at 312; *Davis*, 872 S.W.2d at 749. Factors may include whether guilt of the declarant is inconsistent with that of the defendant, whether the declarant is so situated that she might have committed the crime, the timing of the declaration, the spontaneity of the statement, the relationship between the declarant and the party to whom the statement was made, and the existence of independent corroborative facts. *Dewberry*, 4 S.W.3d at 751; *Cunningham*, 877 S.W.2d at 313; *Davis*, 872 S.W.2d at 749. Further, the trial court may consider evidence that undermines the reliability of the statement as well as evidence corroborating its trustworthiness. *Cunningham*, 877 S.W.2d at 312. The trial court may also consider evidence of the veracity of the declarant. *Id.*[10]

 Murphy's guilt is not inconsistent with James's guilt. Both were riding in the Jeep in which the contraband was being transported, they had traveled together to Dallas, they had shared a room, and they admittedly were together for most of the trip. The evidence is undisputed that Murphy was driving when they were stopped; although the Jeep was rented in James's name, and they had equal access to the suitcases containing the drugs. Therefore, we believe that the first factor weighs in favor of the trustworthiness of

Murphy's self-inculpatory statement. The second factor also weighs in favor of trustworthiness, since the evidence was undisputed that Murphy was driving, she was in charge of loading the suitcases, and she was thus clearly situated to be guilty of the crime of possession of the contraband.

The exact timing of the statement is not shown by the record, although it appears that Murphy made the statement to Detective Mordecai at some point after the women were booked into the jail and after he had interviewed them one or more times. The record reflects that Murphy initiated the interview with Detective Mordecai, in which she made the self-inculpatory statement voluntarily, taking full responsibility for the drugs. Therefore, we find that the third factor weighs in favor of trustworthiness.

The fourth factor of "spontaneity" weighs neither in favor of nor against trustworthiness. There is no evidence that Murphy was under the stress or dominating influence of a startling event but, rather, she had been in jail for at least a couple of days. The fifth factor weighs in favor of trustworthiness because the relationship between the declarant and the person to whom the statement was given was that of a suspect in custody admitting guilt to an investigating officer. *See Cunningham v. State*, 846 S.W.2d 147, 150 (Tex.App.—Austin 1993) (indicating that sufficient corroborating circumstances might include "proof that the statement was against the declarant's interest to an unusual or devastating degree"), *aff'd*, 877 S.W.2d 310 (Tex.Crim.App.1994).

We find independent evidence corroborating both Murphy's inculpatory statements and her statements exonerating

---

**10.** Nevertheless, the trial court may not consider the credibility of the in-court witness to the statement in determining whether sufficient corroborating circumstances exist. *Cunningham*, 877 S.W.2d at 312; *Davis*, 872 S.W.2d at 749.

James. Murphy's guilt is supported by the evidence that she drove the Jeep carrying the contraband and that she had close to $4,000 in cash in her purse. Her statement that James had no knowledge of the drugs is corroborated by James, herself, in consistently denying any knowledge of the drugs to Officer Faglie and Detective Mordecai during the investigation, as well as in her testimony at trial. *See Cunningham*, 877 S.W.2d at 313, n. 2 (disagreeing with lower court that consistent hearsay or testimony from the defendant is not a valid consideration in assessing trustworthiness). Moreover, the evidence was undisputed that James rented the Jeep in her own name and with her credit card because Murphy had no license, corroborating Murphy's statement that she "used" James to get the vehicle.

Evidence tending to undermine the reliability of Murphy's statement as well as the testimony of James as to lack of knowledge of the drugs includes Officer Faglie's testimony that he saw the suitcases in plain view in the back of the Jeep when he shined his flashlight into the vehicle. The suitcases were so heavy that they had to be placed on a cart and wheeled into the station. The manager of the Red Roof Inn where the women had stayed in Dallas testified that he had no bellmen to help load luggage. DEA agent York, who assisted in the investigation and interviewed both women, testified that James admitted she accompanied Murphy to a house at 804 Haverford in a suburb of Dallas, where she was paid to help count stacks of money.

James had over $2,000 in her purse along with five small baggies of cocaine.[11]

James testified that she and Murphy had been friends for several years. Detective Mordecai testified that Murphy told him that she felt sorry for James because she "had so many problems" and wanted to help get her released. This evidence indicates a possible friendship motive for Murphy's statement, but this is a matter to be tested by a jury. *Davis*, 872 S.W.2d at 749. There is no evidence that Murphy attempted to gain an advantage, shift blame, or bargain for leniency for herself.

Under similar circumstances, courts have held that it was error to exclude statements against penal interest tending to exonerate a defendant. *See, e.g., Burks v. State*, 876 S.W.2d 877, 905 (Tex.Crim. App.1994); *Davis*, 872 S.W.2d at 749 (holding factors that might undermine reliability did not outweigh evidence directly corroborating statement); *Fonseca*, 908 S.W.2d at 523 (holding trial court abused its discretion in excluding statements telling consistent story tending to exonerate defendant); *see also State v. Blanco*, 953 S.W.2d 799, 803 (Tex.App.—Corpus Christi 1997, pet. ref'd) (finding *Brady* violation by state in failing to turn over statement of third party that he, not defendant, was perpetrator, which was "strong evidence" for defendant).[12]

Considering the *Cunningham* and *Davis* factors, we believe that the corroborating evidence, even in light of evidence tending

---

11. Agent York did not testify that James told him she saw any drugs at the house or that the women loaded the suitcases at that location.

12. *See Lilly v. Virginia*, 527 U.S. 116, 130, 119 S.Ct. 1887, 1894–95, 144 L.Ed.2d 117 (1999) (noting statements of third-party against penal interest offered as exculpatory evidence by defendant are admissible when circumstances surrounding the statement assure their reliability); *see also Chambers v. Mississippi*, 410 U.S. 284, 302–03, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973) (holding the Due Process Clause affords criminal defendants the right to introduce a third-party's declaration against penal interest when the circumstances surrounding such a statement furnish sufficient assurances of reliability).

to undermine the reliability of Murphy's statement, sufficiently convincing to clearly indicate trustworthiness of Murphy's statement. Her statement that she merely "used" James to get the vehicle and that James had no knowledge of the drugs is sufficiently corroborated that, if believed, it could create a reasonable doubt as to James's guilt. But whether Murphy's statement is to be believed is for the jury. We hold that the trial court's ruling was outside the zone of reasonable disagreement and that there was an abuse of discretion in excluding Murphy's statement.

■ Where erroneous exclusion of evidence is the result of misapplication of the rules of evidence and its admission is not claimed to be required by the United States or state constitutions, we analyze harm under rule of evidence 103(a), which provides that error may not be predicated upon a ruling that admits or excludes evidence unless a "substantial right" of the party is affected. Tex.R. Evid. 103(a); *Potier v. State*, 68 S.W.3d 657, 666 (Tex.Crim. App.2002). The standard is the same as that under rule 44.2(b). Tex.R.App. P. 44.2(b); *Potier*, 68 S.W.3d at 666. A substantial right is affected when the error had a substantial and injurious effect or influence on the jury's verdict. *Johnson v. State*, 43 S.W.3d 1, 3–4 (Tex.Crim.App. 2001).

■ In assessing the likelihood that the error adversely affected the jury's decision, we consider everything in the record, including all evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error, and how it might have been considered in connection with the other evidence. *Morales v. State*, 32 S.W.3d 862, 867 (Tex.Crim.App.2000). We may also consider the State's theory of the case, any defensive theories, closing arguments, and voir dire. *Id.*

■ The issue of James's knowledge of the presence of the drugs was the critical issue in the case. She was charged with unlawful possession, defined by the court as "knowingly or intentionally possess[ing] a controlled substance, with 'possession' defined as actual care, custody, control, or management." She was charged both as a principal and as a party, each of which required proof of intentional or knowing possession of the cocaine and amphetamine. Guilt was dependent on the jury's determination of James's credibility, as to which the jury had only her uncorroborated testimony absent Murphy's statement to Detective Mordecai. We hold that the exclusion of the statement prevented James from adequately supporting her defense and that the ruling substantially and injuriously affected the jury's verdict. We sustain James's fifth point and hold that the judgment and conviction must be reversed and remanded for new trial.

## C. Use of Prior Conviction for Impeachment

James's sixth point contends that the trial court abused its discretion in admitting evidence of her prior conviction in 1991 for possession of cocaine with intent to deliver, for which James satisfactorily completed probation.

Because this matter is likely to arise in a new trial, we will address it. Evidence of the conviction was elicited on cross-examination of James by the State during the guilt/innocence phase of the trial. The trial court overruled James's counsel's objections to the conviction as violating rule of evidence 609 and the Texas and United States Constitutions. Counsel for James then asked for a limiting instruction that the evidence be considered only for impeachment, which the trial court gave to

the jury.[13] The trial court sustained defense objections to the State's attempt to elicit details of the offense. The trial court refused the State's further request during the testimony, as well as in the charge, to broaden the use of the conviction to show intent, knowledge, scheme, or plan.

While the State again concedes error, it argues that James "opened the door" to use her prior conviction for impeachment purposes not only by her testimony, but also by putting on witnesses to her good character. Barbara Reich, a thirty-year teacher from Chicago, testified that James was her "para-professional" and held a position of trust caring for children and handling lunch money. Reich testified that she respected and admired James because she was achieving her goals and "had an intent to move on and change her life and become a solid citizen." Donna Jackson, another teacher from the school where James was employed, testified that James assisted her with small children and that girls in the highschool would come to James for counseling. Jackson stated she believed in James and came to Texas to let people know she was "honest and truthful" and a good person.

James contends that admitting evidence of her prior conviction for impeachment purposes over her objection was harmful error in violation of rule of evidence 609(c)(2), which provides in pertinent part:

**RULE 609. IMPEACHMENT BY EVIDENCE OF CONVICTION OF CRIME**

. . . .

**(c) Effect of Pardon, Annulment, or Certificate of Rehabilitation.** Evidence of a conviction is not admissible under this rule if:

. . . .

(2) Probation has been satisfactorily completed for the crime for which the person was convicted, and that person has not been convicted of a subsequent crime which was classified as a felony or involved moral turpitude, regardless of punishment.

Tex.R. Evid. 609(c)(2). Simply stated, rule 609(a) allows use of evidence of a conviction for impeachment purposes under certain circumstances, but the conviction is not admissible if the defendant or witness satisfactorily completed probation and has not since been convicted of a felony or crime of moral turpitude. Tex.R. Evid. 609(a), (c)(2); *Ex parte Menchaca*, 854 S.W.2d 128, 131 (Tex.Cr.App.1993). The evidence of the conviction introduced by the State established not only the charges against James, but it also confirmed on its face that she satisfactorily completed probation in 1994.

Assuming, without deciding, that a defendant may open the door to impeachment by evidence of a conviction for which probation has been completed, despite the specific prohibition in rule 609(c)(2) against use of such evidence for impeachment purposes, we are not persuaded by the State's argument that James opened the door to evidence of her prior conviction by her testimony or that of her witnesses.

▬▬▬ A defendant opens the door to an otherwise irrelevant criminal history when he or she creates a "false impression" of law-abiding behavior, allowing the state to expose the falsehood. *Hammett v.*

---

13. The trial court instructed the jury at the time of the testimony: "Ladies and gentlemen, the evidence you have just heard from the witness is to be considered by you for the purpose of determining whether or not she's telling the truth. It's not to be used to deter- mine whether or not she had any drugs on the night in question and on the occasion that she's on trial for." The trial court also submitted a written instruction to the jury limiting its consideration of the conviction to her credibility and not as to guilt.

*State,* 713 S.W.2d 102, 105 (Tex.Crim.App. 1986); *Lopez v. State,* 990 S.W.2d 770, 777 (Tex.App.—Austin 1999, no pet.) (citing *Delk v. State,* 855 S.W.2d 700, 704 (Tex. Crim.App.), *cert. denied,* 510 U.S. 982, 114 S.Ct. 481, 126 L.Ed.2d 432(1993)); *see also Prescott v. State,* 744 S.W.2d 128, 131 (Tex. Crim.App.1988). However, the "false impression" exception is given a narrow construction by the case law. *Lopez,* 990 S.W.2d at 778. In order to open the door to use of prior crimes for impeachment, the witness must do more than simply imply that he abides by the law; he must in some way convey the impression that he has never committed a crime. *Id.* at 777; *Lewis v. State,* 933 S.W.2d 172, 179 (Tex. App.—Corpus Christi 1996, pet. ref'd).

The cases holding that a defendant opened the door to evidence of prior convictions have involved false testimony presented by the defendant on the stand of past law-abiding behavior or direct denials of any prior conviction or trouble with the law. *See, e.g., Scott v. State,* 57 S.W.3d 476, 486 (Tex.App.—Waco 2001, pet. ref'd) ("Under Rule 609, when a witness takes the stand and leaves the false impression of his 'trouble' with the police, it is legitimate cross-examination to prove that the witness has been 'in trouble' on other occasions.") (citing *Ramirez v. State,* 802 S.W.2d 674, 676 (Tex.Crim.App.1990)); *Metts v. State,* 22 S.W.3d 544, 549 (Tex. App.—Fort Worth 2000, no pet.) (holding defendant opened door to evidence of prior arrest by testimony that he had "never been involved in anything 'remotely like this'"); *Hernandez v. State,* 897 S.W.2d 488, 495 (Tex.App.—Tyler 1995, no writ) (impeachment regarding pending charges allowed to rebut testimony that defendant had not had "problems" with the law or been in "trouble").

■ We find no similar testimony that James or her character witnesses directly or indirectly presented a false picture that James had no prior charges or convictions. James testified as to her job at the school in Chicago and her version of the events and activities during the trip to Dallas and denied knowledge of the drugs in question, but she never denied or implied an absence of prior trouble with the law or prior charges or convictions, nor did her character witnesses do so. One of those witnesses even testified that James "had an intent to change her life" and to "move on" and "become a solid citizen," implying that James's past may not have been spotless. While James denied knowledge of the smell of cocaine or what it would do to her, that testimony went to the issue of prior usage or addiction. We disagree that James opened the door to the evidence of her prior conviction for impeachment purposes.

As discussed above, we review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Coffin v. State,* 885 S.W.2d 140, 149 (Tex.Crim.App.1994); *Moon v. State,* 44 S.W.3d 589, 593 (Tex.App.—Fort Worth 2001, pet. ref'd). The trial court's ruling will not be disturbed on appeal if it was within the "zone of reasonable disagreement." *Couchman,* 3 S.W.3d at 158. Contrary to rule 609(c)(2), we are constrained to hold that an abuse of discretion has been shown by admission of the prior conviction when James had served out her probation.

■ Our harm analysis for improper admission of evidence as the result of misapplication of the rules of evidence is whether a "substantial right" is affected. Tex.R. Evid. 103(a); Tex.R.App. P. 44.2(b). As previously noted, James's guilt was seriously contested. James consistently denied knowledge of the presence of the contraband. There was no evidence that any witness saw her handling the drugs.

**182**

Furthermore, there was no evidence of any clues indicating the presence of the drugs in the vehicle such as smell, spilled powder, an open suitcase, nor any evidence of fingerprints on the suitcases. The State's case against James consisted of circumstantial evidence in attempting to establish her knowledge. By allowing the evidence of her prior conviction, the jury was permitted to hear highly prejudicial evidence that she had previously been convicted of virtually the same offense for which she was on trial. As stated by the Fifth Circuit under similar circumstances:

> We can hardly imagine anything more prejudicial to Nero than allowing the jury in this armed robbery case to hear ... that Nero had been convicted twice before of burglary and once on drug charges. The jury may well have convicted Nero of the charged offense because it was aware of the prior convictions.

*Nero v. Blackburn,* 597 F.2d 991, 994 (5th Cir.1979). Moreover, the State more than once referenced the prior conviction in its closing argument, emphasizing the error, and even attempted to argue, contrary to the court's earlier ruling, that the conviction showed a prior plan and scheme as well as being "consistent with her past." We hold that the improper admission of the prior conviction encouraged the jury to find James guilty, that the jury may well have based its verdict on that evidence, and that it had a substantial and injurious effect on the verdict. We sustain James's sixth point.

### CONCLUSION

Because we have sustained James's fifth and sixth points, and it is unlikely that the remaining issues raised by her seventh, eighth, and ninth points will arise again on a second trial, it is unnecessary to address those points concerning prosecutorial misconduct, improper argument, and error in preventing proper voir dire questioning. We reverse and remand this case for a new trial.