

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00349-CR
### NO. 02-12-00350-CR

PATRICK
WASHINGTON

APPELLANT

V.

THE STATE OF TEXAS

STATE

------------

## FROM THE 211TH DISTRICT COURT OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

## I. Introduction

In three issues, Appellant Patrick Washington appeals his aggravated robbery convictions. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II.  Background

At the conclusion of Washington's trial, a jury convicted him of aggravated robbery with a deadly weapon of both Janette Murillo and Melissa Seftas and then assessed ninety years' confinement and a $5,000 fine in each case.  The trial court entered judgment accordingly, and these appeals followed.

## III.  Admission of Evidence

Washington complains that the trial court abused its discretion "by improperly permitting testimony throughout the trial that substantially harmed" him.  Specifically, he complains of improper impeachment, improper bolstering, and unfair prejudice.  We give great deference to the trial court's discretion, and its ruling should not be reversed as long as it is within the "zone of reasonable disagreement."  *Salazar v. State*, 38 S.W.3d 141, 151 (Tex. Crim. App.), *cert. denied*, 534 U.S. 855 (2001); *see also Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g) (setting out abuse of discretion standard).

## A.  Impeachment

In his first issue, Washington complains that the trial court abused its discretion under rule of evidence 609 by admitting his misdemeanors that did not involve moral turpitude during cross-examination when he "did not describe himself as someone who ha[d] never been in trouble with the law before."  We previously addressed this issue in *West v. State*, 169 S.W.3d 275, 278–79 (Tex. App.—Fort Worth 2005, pet. ref'd) (citations omitted), stating,

An accused puts his character for veracity in issue by taking the stand, and he may be impeached in the same manner as any other witness. Generally, prior offenses are inadmissible for impeachment purposes unless the offense resulted in a final conviction for either a felony or a crime involving moral turpitude and the conviction is not too remote in time. However, an exception arises when a defendant testifies and leaves a false impression as to the extent of his prior arrests, convictions, charges against him, or "trouble" with the police generally. In such a case, the defendant is deemed to have "opened the door" to an inquiry into the veracity of his testimony, and evidence of the defendant's prior criminal record is admissible to correct the false impression.

Generally, the false impression the State seeks to rebut must be created by the defendant through direct examination. However, when a defendant voluntarily testifies on cross-examination concerning his prior criminal record, without any prompting or maneuvering on the part of the State, and in so doing leaves a false impression with the jury, the State is allowed to correct that false impression by introducing evidence of the defendant's prior criminal record.

The false-impression exception is a narrow one, and any statements that are alleged to have left a false impression must be viewed in context. *Grant v. State*, 247 S.W.3d 360, 367 (Tex. App.—Austin 2008, pet. ref'd) (citing *James v. State*, 102 S.W.3d 162, 181 (Tex. App.—Fort Worth 2003, pet. ref'd)). "The cases holding that a defendant opened the door to evidence of prior convictions have involved false testimony presented by the defendant on the stand of past law-abiding behavior or direct denials of any prior conviction or trouble with the law." *James*, 102 S.W.3d at 181.

In analyzing the exception's applicability, we consider the defendant's statement in relation to the question asked, examine how broadly the question asked could be interpreted, and analyze the relationship between the question

3

asked and the trial's major substantive issues. *Grant*, 247 S.W.3d at 368. In *West*, we held that the trial court had abused its discretion by allowing the prosecutor to ask West whether he had been arrested "more than twenty times" after West testified during cross-examination that he had been "shocked" that he was being arrested, handcuffed, and taken to jail. 169 S.W.3d at 277, 279, 281. We noted that West did not respond that he had never been "in trouble" with the law, that his record was clear of any prior arrests, or that he had never been arrested for DWI, the offense for which he was being tried. *Id.* at 277, 279. West's first two statements that he was shocked were made in response to the prosecutor's questions about his sobriety test performance, and the third was made in response to questions about whether his memory would have been more accurate on the night of the offense or at trial. *Id.* at 279.

We concluded that West's statements about being shocked "communicated his feelings at the time of his arrest, not an impression about his criminal history," reasoning that a person may still feel shocked at being arrested, even if he has already been arrested multiple times. *Id.* Further, based on that record, we concluded that the questions, the answers, and the overall tenor of the cross-examination did not create a false impression about West's prior criminal history. *Id.*; *see also James*, 102 S.W.3d at 181 (holding that the trial court abused its discretion by admitting a prior conviction when neither appellant nor her character witnesses directly or indirectly presented a false picture that she had no prior charges, convictions, or trouble with the law).

4

Here, in contrast, the context leading up to the admission of Washington's prior misdemeanor convictions was Washington's description during cross-examination of his interaction with the police at the police station. Washington admitted to his prior robbery convictions and his conviction for unauthorized use of a motor vehicle during his direct testimony. During cross-examination, he testified that he was not under arrest at the beginning of his interaction with the police and that he sat in a police car for around forty-five minutes in handcuffs before the police took him to a holding facility and put him in an interview room. The following dialogue between Washington and the prosecutor then ensued:

Q. . . . What did they tell you [that] you were under arrest for?

A. The detectives came in and asked me questions about a robbery. They didn't say that I was being arrested.

Q. What did you think was happening? Did you think you were under arrest?

A. No, because I hadn't committed a robbery.

Q. So you don't think -- now, you're no stranger. You've been arrested before. Right?

A. That was my first time getting in trouble.

Q. Okay. That was the first time you got in trouble?

A. Yes, sir.

Q. All right.

A. As far as some tickets and stuff of that nature, a misdemeanor charge.

Q. Which ones were those?

5

The parties then approached the bench. The prosecutor argued that Washington had opened the door to the misdemeanors through his unsolicited response, and the trial court allowed him to question Washington about his 1999 possession of marijuana and unlawful carrying of a weapon convictions.

When the prosecutor asked Washington to confirm that he had been arrested before, Washington had already admitted in his direct testimony to having been convicted of two aggravated robberies and unauthorized use of a motor vehicle and had agreed at the beginning of his cross-examination that he had robbery convictions.[2] But instead of agreeing again or pointing out that he had already testified about his prior convictions for those offenses, Washington replied, "That was my first time getting in trouble." Washington then volunteered, "As far as some tickets and stuff of that nature, a misdemeanor charge," without being asked a question by the prosecutor. *See, e.g.*, *Metts v. State*, 22 S.W.3d 544, 549 (Tex. App.—Fort Worth 2000, pet. ref'd) ("[W]hen a witness testifies gratuitously as to some matter that is irrelevant or collateral to the proceeding and falsely states or insinuates that he has not had trouble with the police in the past, he has opened the door to impeachment."). Based on this record, we cannot say that the trial court abused its discretion by concluding that Washington had volunteered the information about his prior criminal record and

---

[2]The prosecutor asked Washington, "And you're no stranger to robberies. You know what robberies are?" Washington agreed, "Right. Absolutely." He gave the same answer when asked whether he had been to the penitentiary for two separate robberies.

6

had left a false impression, particularly to the extent that he had made the misdemeanors sound like traffic tickets instead of the drug possession and unlawful carrying of a weapon convictions that they actually were. *See id.* at 548–49 (holding that when appellant testified that he had never been involved in anything "remotely like" his indecent exposure charges, and he and two others testified about his good and law abiding character, the trial court's ruling that he had opened the door to the admission of evidence of his prior arrest for indecent exposure was not outside the zone of reasonable disagreement); *see also Grant*, 247 S.W.3d at 369 ("Grant's statement that he had 'never done that to anybody' was sufficient to invite impeachment with the prior assault evidence that the State introduced."). We overrule Washington's first issue.

## B. Other Evidence

In his second issue, Washington claims that the trial court abused its discretion by admitting videotapes of Seftas's and Murillo's photo lineup process at the police station after they had already identified him in open court and testified that they had identified him from photo lineups and that this evidence was more prejudicial than probative under rule of evidence 403. And in his third issue, Washington complains that the trial court abused its discretion by allowing Detective Weisinger to testify about "women's purses with no identification" found inside Washington's hotel room because those items' prejudicial impact outweighed their probative value under rule of evidence 403.

7

Assuming without deciding that the trial court abused its discretion under any of these theories, we will conduct a harm analysis to determine whether these alleged errors had a substantial and injurious effect or influence in determining the jury's verdict. *See* Tex. R. App. P. 44.2(b); *see also Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001) (applying nonconstitutional harm standard to erroneous admission of evidence).

### 1. Harm Analysis

Under rule 44.2(b), we disregard the error if it did not affect appellant's substantial rights. Tex. R. App. P. 44.2(b); *see Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon*, 49 S.W.3d at 365; *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

In making this determination, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also

8

consider the jury instructions, the State's theory and any defensive theories, whether the State emphasized the error, closing arguments, and even voir dire, if applicable. *Id.* at 355–56.

### 2. Pretrial and Voir Dire

Before voir dire, Washington's attorney informed the trial court and the State that Washington planned to testify and that the crux of the defense's case was that the alleged victims were drug dealers, that this was a drug deal "gone bad," and that "it's our position they were lesbians and he had a sexual relationship with one of them, and that's the reason why they have wrongfully accused him."

During voir dire, the prosecutor made sure that the potential jurors understood that in lots of cases, DNA evidence or fingerprints were not available and that television shows like *CSI* did not represent reality. He also pointed out that their job was to judge the credibility of the witnesses, and he explained how a double-blind photo lineup worked to keep from indirectly influencing a witness's viewing of the lineup. Neither side made an opening statement.

### 3. The State's Case

Seftas, a twenty-nine year-old store manager, testified that on January 12, 2010, she, her girlfriend Murillo, and Murillo's two children lived in a two-bedroom apartment in an area that "wasn't the best," in the part of Dallas located in Denton County. The women were expecting Seftas's friend, who was going to drop his son off for Seftas to babysit. At around 11:15 p.m., when Murillo

answered the knock at the door, she saw Washington and another man and told Seftas, "I think it's for you because I don't know who it is."

While Seftas and Murillo traded places at the door, Washington pulled his turtleneck shirt up over his face; the other man was wearing a black, puffy jacket that covered his face to his nose.[3]  Seftas asked Washington, "Can I help you? What's going on?"

Seftas said that Washington pushed his way into the apartment with a black handgun[4] and pointed it at her head.  Both of the men demanded money.  The man in the black jacket grabbed Murillo's purse.  After Murillo begged him not to take her purse, the man threw it at her and ordered her to give him the money out of it.  Murillo had around $40, which she gave to the men.  The men also took the loose change that was by the couch, the money that Murillo had laid out on the couch while she was paying bills, and some lottery tickets that "were already scratched winners."

After Washington demanded more money, Seftas told him that there was money in her car.  Seftas said that it was the only thing she could think of to get

---

[3]During cross-examination, Seftas agreed that in her written statement to the police around a week after the offense, she had indicated that the second man wore a mask, but she said that although at first appearance, it looked like it was a mask, "after, you know, thinking about it," she realized "that the point at the nose was just the zipper."  Murillo testified that the other man was wearing a mask, "but it was like one of those ski masks that just did the bottom.  It wasn't like a whole head thing."

[4]Murillo described the gun as "a short like little pistol-looking gun" and said that it was either black or gun-metal gray and not a revolver.

10

the two men out of the apartment because she was afraid for Murillo, the children—who were asleep in the next room—and herself. Murillo said that her biggest fear at the time was that Washington was going to kill her with her kids in the next room. As soon as the men left with Seftas, Murillo shut and locked the door and then called 911.

Washington walked Seftas down the stairs with the gun to her head and told her that if she tried anything, "they would find [her] in a bag in the woods." She opened the car door remotely, and while Washington rummaged through her car, Seftas backed up and ran back to her apartment. She saw the men running away through the woods as she made her escape. Seftas said that her car had contained a $300 money order made out to the apartment complex for her rent and that the men stole it. They also tried to rip out her car stereo and took some of the CDs that were in her car.

Both Seftas and Murillo testified that they had recognized Washington because his girlfriend's apartment was in the same complex, and they both identified him at trial as the man who had robbed them. When the police responded to Murillo's 911 call, Seftas told them that she thought his name was "Mike" because that was the name he had given once when he "bum[med] a cigarette" from her.[5] Murillo testified that he wore black gloves when he handled the gun.

---

[5]Washington testified that he had never smoked cigarettes.

Dallas Police Detective James Weisinger was assigned to investigate the robbery the day after it occurred. He knew that the suspect had been identified as "Mike," and he went to interview Seftas and Murillo. From the information that Seftas gave him, Detective Weisinger went to the apartment complex's leasing office to find out who lived in Apartment 616 and then contacted Jessica Green, the apartment's occupant. Green gave him Washington's name, and after he obtained a photo of Washington, he compiled a photo lineup and gave it to Detective Otha Hampton to conduct a double-blind photo lineup.

Two days after the robbery, Seftas went to the Dallas police station and was videotaped identifying Washington from the double-blind photo lineup conducted by Detective Hampton, the lineup administrator.[6] Over Washington's objections, the trial court admitted the videotape and allowed it to be published to the jury. The videotape shows that Seftas's identification of Washington was immediate and decisive. Based on Seftas's identification, Detective Weisinger obtained an arrest warrant for Washington.

Detective Weisinger subsequently created a photo lineup for Murillo to view when he learned that she had also suffered a loss in the robbery, and he obtained another arrest warrant after she also identified Washington. The videotape of Murillo identifying Washington from the double-blind photo lineup

---

[6]Detective Hampton testified that a double-blind photo lineup is a lineup that is created by another detective and then administered by someone who does not know who the suspect is.

12

was admitted over Washington's objections and published to the jury. When asked by the officer conducting the photo lineup how confident she was in her identification, Murillo said, "Confident enough that I feel like I'm going to cry, I started shaking, and it upset my stomach."[7]

Washington was arrested on January 27, 2010, and Detective Weisinger procured a search warrant for Washington's motel room to search for the black gun used during the offense, the music CDs, and the $300 money order. When police searched Washington's hotel room, they found a black semiautomatic, 9-millimeter Taurus pistol submerged in the toilet tank, several women's purses with no identifying information, eighteen music CDs—but none belonging to Seftas—multiple cell phones, some video games, and eight rounds of ammunition for a 9-millimeter weapon. Detective Weisinger agreed that there were two women present at the motel room when Washington was arrested and that this could explain the purses. The trial court admitted the gun into evidence.

### 4. The Defense's Case

Washington's sister and his stepsister testified that after a dying relative was released from the hospital, the family gathered together on January 12, 2010, to say their goodbyes. They claimed that Washington was with family all that day and night. During cross-examination, both admitted that they had never called Detective Weisinger to tell him about Washington's alibi.

---

[7]Seftas and Murillo both testified that Murillo had vomited from fear while on the phone with 911 after the robberies.

13

During his direct examination, Washington testified that he had two prior aggravated robbery convictions and a conviction for unauthorized use of a motor vehicle from 2003. He agreed that prior to January 12, 2010, he knew Murillo and Seftas, having seen them from time-to-time when he shared Apartment 616 with Green in the same apartment complex. Washington moved out of Green's apartment at the end of October 2009, but they reunited two months later on Christmas Eve. Washington claimed that he and Seftas had engaged in a sexual relationship. He denied robbing the two women and said that he was with his family on January 12, 2010.

During cross-examination, the trial court admitted into evidence the written statement that Washington had given to police. Washington said that he did not write anything about going to his sister's and stepsister's homes because Detective Weisinger did not ask him about that. Washington instead wrote in his statement,

> White women in my appartments I use 2 deal with. Got dope from her from time 2 time. Delt bad with a friend of mind one night he took his the dope back n it was not a pomblem. She stay n the next unit from me with her girl 5-5 hevy girl. She wers glasses.[8]

Washington complained that the statement was not based on the robbery but rather was about how he had met Seftas and Murillo. After Washington testified about his conversation with the police, the trial court concluded that he had opened the door to his misdemeanor convictions through an unsolicited

[8]We have included the statement as Washington wrote it in his own hand.

14

response, as we discussed above in our analysis of his first issue, and allowed the State to question Washington about his 1999 possession of marijuana and unlawful carrying of a weapon convictions.

### 5. State's Rebuttal

Detective Weisinger testified that when Washington was taken to the police station, he told Washington that he was under arrest for aggravated robbery and then took a written statement from him. He agreed that he had asked Washington how he knew Seftas and Murillo but stated that he had also asked Washington about the offenses. Washington told him that he had not robbed the two women, and then he gave the written statement. Detective Weisinger stated,

> [Washington] said that he went up to the apartment where the -- the girls were because they had sold a friend some bad dope and that he knew where they lived, so he took the guy up there. But he said he didn't step in the apartment. And so the guy went in, got his money back, and left.

Detective Weisinger said that Washington never told him anything about being at a party for his dying stepsister and that no one ever contacted him about an alibi. Seftas testified that she had never had a sexual relationship with Washington and that she had never dealt drugs.

### 6. Closing Arguments

The State waived opening. Washington's attorney argued that poor police work meant that Washington should be acquitted because there were no fingerprints. He pointed out that Seftas and Murillo disagreed on what the

15

perpetrators were wearing and that their failure to shut the door when they saw someone they did not know was "ridiculous." He also argued that it made no sense for Washington to go into the apartment without a mask on, saying, "Who in their right mind is going to rob somebody without a mask on?" And he said Seftas and Murillo's version of events was implausible because they were asking the jury to believe that the perpetrators would leave a victim in the apartment to call 911 while escorting the other one to her car and to believe that a robber would allow Murillo to keep her purse.

Washington's attorney argued that Washington and his witnesses were more credible than the State's witnesses. And while he pointed out that it was obvious from Washington's written statement that he was "not a very educated man," he also argued, "[W]hy would anybody be that stupid to go rob somebody at gunpoint without a mask on, somebody you knew? . . . Dude, is that stupid or what? It's not going to happen."

The prosecutor then responded to Washington's arguments by arguing that Seftas and Murillo were credible, reminding the jury about their reactions in the photo lineup recordings and that they had no motivation to lie. He stated, with regard to the videotaped lineups, "Do they think, well, let's see, hmm -- I mean, they must be the smartest people on earth because they're thinking, well, you know, in a couple of years we're going to be in front of a jury and we're going to have to make this look good." He argued that Washington's witnesses had

16

perjured themselves and that Washington had made up his story about having had a sexual relationship with Seftas.

The prosecutor argued that Washington was stupid enough to rob someone who could identify him because "[h]e's been thrown in prison already for two separate aggravated robberies, which means those people identified him too. He got caught on those too, so he's not the smartest guy out there." The prosecutor rebutted Washington's fingerprint argument by pointing to Murillo's testimony that the man with the gun wore gloves. And he asked if Washington did not commit the robbery, then why did he put a fake alibi in his written statement: "If he didn't do it, why is he trying to give someone else a motive for doing it?"

### 7. Analysis

While Washington complains that the improper admission of the videotapes caused him unfair prejudice, the short videos of Murillo and Seftas were merely cumulative of evidence that had already been presented by both women, who had identified Washington at trial and in double-blind photo lineups as someone they had seen at their apartment complex. Further, Washington admitted that he had been living in the same apartment complex and had seen the women there and testified that he had been having a sexual relationship with one of them. While the prosecutor argued in his closing argument that the women's videotaped reactions boosted their credibility, Washington's own testimony made their reactions unnecessary with regard to his identity.

17

Therefore, we conclude that in the context of the entire case against Washington, the error in the admission of this evidence, if any, did not have a substantial or injurious effect on the jury's verdict and did not affect his substantial rights. *See King*, 953 S.W.2d at 271 (setting out standard for harm under rule 44.2(b)). We disregard the error, if any, and overrule Washington's second issue.

Further, with regard to the admission of Detective Weisinger's testimony about the "women's purses with no identification" found in Washington's hotel room, the prosecutor did not mention these items in his closing argument, the amount of time spent on these items was minimal when compared to the rest of the evidence presented at trial, and Weisinger agreed that two women were present at the motel room when Washington was arrested and that their presence could have explained the purses. *Cf.* Tex. R. Evid. 403 (stating that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence). The crux of the jury's decision, as argued by both parties in closing, was credibility—whether to believe Seftas and Murillo or to believe Washington. Therefore, to the extent that admitting Detective Weisinger's brief testimony about finding other purses in Washington's motel room was error, we also conclude that, in the context of the entire case against Washington, it did not have a substantial or injurious effect on the jury's verdict

18

and did not affect his substantial rights.  *See King*, 953 S.W.2d at 271.  We disregard the error, if any, and overrule Washington's third issue.

## IV.  Conclusion

Having overruled all of Washington's issues, we affirm the trial court's judgments.

PER CURIAM

PANEL:  MCCOY, WALKER, and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  July 25, 2013

19