

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-13-00550-CR

ANGELA ANN RHODES A/K/A        APPELLANT
ANGELIA ANN DAVIS A/K/A ANGIE
ANN DAVIS

V.

THE STATE OF TEXAS        STATE

----------

FROM THE 355TH DISTRICT COURT OF HOOD COUNTY
TRIAL COURT NO. CR12371

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellant Angela Ann Rhodes a/k/a Angelia Ann Davis a/k/a Angie Ann

Davis (Rhodes) appeals her conviction for driving while intoxicated (DWI). In two

---

[1]*See* Tex. R. App. P. 47.4.

issues, Rhodes argues that the trial court erred by denying her motion to suppress. We will affirm.

## II. BACKGROUND

The State indicted Rhodes for the offense of driving while intoxicated, subsequent offense. After the trial court denied her motion to suppress, Rhodes pleaded guilty and elected to have a jury assess punishment. The jury assessed punishment at eight years' confinement. The trial court suspended the imposition of the sentence and entered a judgment that Rhodes be placed on community supervision for six years. This appeal involves the trial court's denial of Rhodes's motion to suppress.

Granbury Police Officer Colin Walker testified at the first of three hearings regarding Rhodes's motion to suppress. Walker testified that he was working the night shift as a patrol officer on the night of November 17 and early morning of November 18, 2012. Just after 1:00 a.m. on November 18, 2012, Walker, in his patrol unit driving westbound, approached the intersection of Highway 377 and Western Hills Trail. According to Walker, this intersection was the primary route used for patrons exiting a bar called Wild Country Night Club, which was located on Western Hills Trail just south of Highway 377. Walker averred that Wild Country Night Club is frequented by persons who are sometimes arrested for DWI. He also stated that this intersection was "dangerous" and that police had worked "many accidents there." As Officer Walker approached the intersection,

2

a black 2005 Honda Accord approaching the intersection on Western Hills Trail drew his attention. Rhodes was driving the Accord.

Walker testified that he observed Rhodes's vehicle fail to properly stop at the stop sign as it approached the intersection. More specifically, Walker said that he observed Rhodes pull past the "stop line" so that the rear bumper of her vehicle was in front of the stop line before it came to a complete stop. At the same time, Walker observed another vehicle traveling eastbound on Highway 377. By Walker's account, the eastbound vehicle nearly struck Rhodes's vehicle due to the manner in which she improperly came to a stop. Walker said that because this was a dangerous intersection, the stop sign and adjacent stop line on Western Hills Trail were purposely set back from Highway 377 for safety reasons. Walker said that it would not have been a traffic violation for the vehicle to make a complete stop behind the stop line and then inch forward to get a better view but that because Rhodes did not come to a stop until she was all the way past the stop line, she had committed a traffic violation. Notably, Walker did not specifically say how far beyond the stop line Rhodes's back bumper was when her vehicle came to a complete stop. Using a photograph of the intersection, the State had Walker show the trial court the location of the stop line and the stop sign.

Walker averred that Rhodes's failure to stop at the designated "stop line" gave him probable cause to stop her vehicle for a traffic violation. In addition, Walker testified that based on his training and experience, given the time of

3

morning, the location of a neighboring bar whose patrons had been arrested for multiple DWI offenses, the dangerous nature of the intersection, and Rhodes's near collision with another vehicle, he had reasonable suspicion to stop her for DWI.

Rhodes called John Schloeman at the first hearing, and he testified that he was a private investigator who lived in Hood County. Schloeman said he was a retired 28-year veteran of the Fort Worth Police Department whose responsibilities previously included patrol, gang, violent crimes, zero intolerance, and fatality-accident investigations. Schloeman was not present at the time Walker stopped Rhodes, but he said that he reviewed Walker's written arrest report. Schloeman said that he took photographs of the intersection of Western Hills Trail and Highway 377 at the location where Officer Walker indicated he spotted Rhodes's alleged failure to stop. Utilizing one of his own photographs, Schloeman opined that the stop line at the intersection was heavily worn and not clearly visible. Schloeman averred that the transportation code required drivers to stop at the stop line adjacent to a stop sign but that in the absence of a "clearly marked" stop line, the transportation code required the driver to stop at the place nearest the roadway where the operator could safely view approaching traffic.

According to Schloeman, the stop line at the intersection in question did not meet the definition of a clearly marked stop line. Rhodes also admitted into evidence an alleged scaled diagram of the intersection in question that Schloeman had rendered. Using the diagram, Schloeman disputed Walker's

testimony that Rhodes's vehicle would have nearly struck a vehicle traveling in the outermost eastbound lane of Highway 377. Schloeman testified that the stop line adjacent to the stop sign was just over twenty-nine feet from the outside of the nearest lane of traffic. By Schloeman's account, the edge of the pavement on Highway 377 was approximately nineteen feet from the stop line and the length of Rhodes's vehicle was fifteen feet nine inches. Thus, by Schloeman's measurements, Rhodes could have pulled three feet past the stop line without interfering with traffic on Highway 377. Schloeman opined that if another vehicle passed in the outside eastbound lane of Highway 377, it would have been at least thirteen feet beyond the point Rhodes's vehicle stopped if Rhodes's back bumper was just beyond the stop line.

Schloeman said that he had driven past the intersection at nighttime and that he was unable to see the stop line from what he determined would have been Walker's perspective. Schloeman also said that the street light across the intersection was not working at the time he drove by the intersection but that he did not know if it was working at the time Walker stopped Rhodes. Schloeman made a video of the intersection at 1:00 a.m. on February 8, 2013, and Rhodes attempted to introduce the video into evidence. The State objected to the video on the basis that Schloeman had admitted he made the video in February of 2013 and had no knowledge of the lighting conditions or the condition of the stop line on November 18, 2012, the morning Walker stopped Rhodes. The Court

5

sustained the objection. At the end of this first hearing, the trial court denied Rhodes's motion to suppress.

At the second hearing on Rhodes's motion to suppress, Rhodes testified that prior to the hearing, she viewed the February 2013 video made by Schloeman. Rhodes said that as far as she recalled, the lighting in the video was the same as it was on the night Walker stopped and arrested her. Rhodes testified that she drove by the intersection several times in the days following her arrest and could not see a stop line at the intersection. According to Rhodes, most of the times that she drove by the intersection, it was after dark. Rhodes also said that she could not see the stop sign at night when traveling along Highway 377.

Rhodes averred that on the morning Walker stopped and arrested her, as she was approaching the intersection of Western Hills Trail and Highway 377, she saw a police officer ahead, so she stopped at the stop sign and then eased up to make sure she could proceed safely. Rhodes testified that she did nothing to impede traffic on Highway 377 in any way.

On cross-examination, the State questioned Rhodes about her perception of the events. Rhodes agreed that the stop happened just after 1:00 a.m. and admitted she was coming from the Wild Country Night Club. Rhodes said that she had consumed four alcoholic beverages prior to being pulled over that morning—two prior to going to the Wild Country Night Club and two more at the club. Rhodes said that she believed her perception was clear on the morning of

6

the arrest, but she agreed her perception would not have been as clear as a trained police officer familiar with the area and where the stop sign and stop line were located. During the hearing, Rhodes's attorney said that he was attempting to lay a proper predicate so that he could have two videos that Schloeman had made of the intersection "admitted for purposes of suppression." But even though Rhodes testified at the second hearing, her attorney never sought to admit the videos into evidence for any other purpose than as part of her "offer of proof."

In the third hearing related to Rhodes's motion to suppress, Rhodes ultimately supplemented her offer of proof with the two videos from Schloeman, one purported to be of him driving by the intersection at night traveling at forty-five miles per hour and a second one purported to be him driving by the intersection at night traveling at thirty-five miles per hour. The state did not object to them being made a part of her offer of proof.

The trial court entered findings of facts and conclusions of law. Among other findings, the trial court found that Rhodes had "failed to come to a stop at or behind the stop line" and that she had failed "to come to a complete stop and nearly collide[d] with a vehicle that was traveling eastbound on [] Highway 377." In its conclusions of law, the trial court concluded that Walker "had reasonable suspicion that [Rhodes] may [have been] intoxicated and therefore engaging in the criminal activity of driving while intoxicated based upon [her] abnormal driving behavior, the time of night, the location in relation to the drinking establishment,

7

and the officer's experience." The trial court also concluded that Walker had probable cause to believe Rhodes had committed a traffic violation. After her plea, the jury's assessment of punishment, and the trial court's entry of judgment, this appeal followed.

### III. DISCUSSION

In part of her first issue, Rhodes argues that the trial court erred by denying her motion to suppress because the trial court's finding of fact that she "fail[ed] to come to a complete stop and nearly collide[d] with a vehicle" is not supported by the record. Rhodes argues that the record establishes that she did in fact stop and that there was sufficient space between where her vehicle did stop and oncoming traffic. Specifically regarding the near collision, Rhodes contends that the record possesses "empirical evidence that is directly at odds with Walker's testimony" that she nearly collided with another vehicle and that "Walker's claim of the near collision involves substantial speculation on his part." Thus, according to Rhodes, this court should ignore this finding of fact and review "the issue of the purported near collision . . . on the de novo bases [sic]." According to Rhodes, without this finding of fact, the trial court's conclusion of law that Walker possessed reasonable suspicion that she was driving while intoxicated was incorrect and the trial court should have sustained her motion to suppress.

We conclude that the record supports the trial court's finding that Rhodes nearly collided with another vehicle, and even assuming that the trial court's

8

finding that Rhodes failed "to come to a complete stop" is to be interpreted that she never stopped at all—as opposed to that she failed to properly stop, the trial court's conclusion of law that Walker possessed reasonable suspicion to stop Rhodes is still supported by the record and the trial court did not err by denying her motion to suppress.

**A.      Standard of Review on Motion to Suppress**

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review.  *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review.  *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.).  The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony.  *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), *modified on other grounds by State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006).  Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App.

9

2002). But when application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

Stated another way, when reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings. *Kelly*, 204 S.W.3d at 818–19. We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id.* at 818.

We must uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case even if the trial court gave the wrong reason for its ruling. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), *cert. denied*, 541 U.S. 974 (2004).

### B. Reasonable Suspicion to Stop

A detention, as opposed to an arrest, may be justified on less than probable cause if a person is reasonably suspected of criminal activity based on specific, articulable facts. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880

10

(1968); *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000). An officer conducts a lawful temporary detention when he or she has reasonable suspicion to believe that an individual is violating the law. *Crain v. State*, 315 S.W.3d 43, 52 (Tex. Crim. App. 2010); *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). Reasonable suspicion exists when, based on the totality of the circumstances, the officer has specific, articulable facts that when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity. *Ford*, 158 S.W.3d at 492. This is an objective standard that disregards any subjective intent of the officer making the stop and looks solely to whether an objective basis for the stop exists. *Id.*

Specifically to DWI offenses as basis for temporary detentions, time of day is a relevant factor in determining reasonable suspicion that a driver could be intoxicated. *Foster v. State*, 326 S.W.3d 609, 613 (Tex. Crim. App. 2010). Furthermore, location near a bar district where police have made numerous arrests for DWI is a relevant factor in determining reasonable suspicion that a driver is intoxicated. *Id.* And a driver's erratic driving may furnish a sufficient basis to form reasonable suspicion that a driver is intoxicated. *James v. State*, 102 S.W.3d 162, 172 (Tex. App.—Fort Worth 2003, pet ref'd). Moreover, law enforcement training or experience may factor into a reasonable-suspicion analysis, but reliance on this special training is insufficient to establish

11

reasonable suspicion justifying a temporary detention absent objective factual support. *Ford*, 158 S.W.3d at 492.

## C. Analysis

Here, Rhodes argues that the trial court's conclusion of law that Walker had reasonable suspicion to stop her for DWI is not supported by the record because there is no evidence that she nearly collided with another vehicle. Rhodes's argument is built upon her interpretation of Walker's testimony that Rhodes did not stop until her back bumper was past the stop line, which was adjacent to the stop sign. Rhodes interprets this testimony to mean that her back bumper was barely past the stop line. Thus, according to Rhodes, buttressed by the evidence she presented at the suppression hearing, she could have "pulled up three feet past the stop line and still not be interfering with somebody [who's] driving on the shoulder of the road."

But Rhodes's interpretation is not the only possible interpretation of Walker's testimony, and the trial court evidently interpreted Walker's testimony differently than she does. *See Amador*, 221 S.W.3d at 673 (reasoning that a reviewing court is to give almost total deference to the trial court's rulings on questions of historical facts, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor). Indeed, Walker never testified as to how far Rhodes's back bumper was in relation to the stop line or stop sign; rather, Walker testified that Rhodes's vehicle proceeded through the stop line to an extent that "The rear bumper of [her] vehicle was in

12

front of the designated stop line." Walker's very next statement was that "[a]t that very time, another vehicle was traveling eastbound . . . and almost struck [Rhodes's vehicle]." A logical interpretation of this testimony is that Rhodes's back bumper was past the stop line far enough that the front of her vehicle almost entered into the intersection and struck a vehicle heading toward her from the east. *See Kelly*, 204 S.W.3d at 818–19 (reasoning that when a trial court makes explicit fact findings, a reviewing court should determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings). Moreover, even assuming that the trial court's finding of fact that Rhodes never came "to a complete stop" is undermined by Walker's testimony that she did in fact stop before colliding with the oncoming vehicle, that testimony alone does not eviscerate the trial court's conclusion of law that Walker possessed reasonable suspicion that Rhodes was driving while intoxicated.

When viewing the evidence in the light most favorable to the trial court's ruling, the totality of the circumstances demonstrates that Walker had reasonable suspicion that Rhodes was driving while intoxicated. *Wiede*, 214 S.W.3d at 24. The record evidence reveals that Rhodes nearly collided with a vehicle at an intersection that Walker testified is "a dangerous area" and that the police had "worked many accidents there." *See Ford*, 158 S.W.3d 494 (reasoning that law enforcement experience may factor into a reasonable-suspicion analysis); *see also James*, 102 S.W.3d at 172 ("Erratic or unsafe driving may furnish a sufficient

13

basis for a reasonable suspicion that the driver is intoxicated even absent evidence of violation of a specific traffic law."). Walker further testified that the intersection where he observed Rhodes is a common thoroughfare for patrons of a club where alcoholic drinks are served and whose patrons are sometimes arrested for DWI. *See Foster*, 326 S.W.3d at 613 (reasoning that "location near a bar district where police have made numerous DWI arrests is also a relevant factor in determining reasonable suspicion"). Walker also testified that 1:00 a.m. in the morning is a factor he considered in forming his suspicion that Rhodes was driving while intoxicated. *See id.* (reasoning that "time of day is a relevant factor in determining reasonable suspicion"). We hold that the trial court correctly found that Walker possessed specific, articulable facts that when combined with rational inferences, led him to form a reasonable suspicion that Rhodes was driving while intoxicated. *See id.* at 614 (reasoning that in light of the time of night, the location, the officer's training and experience, and defendant's aggressive driving, it was rational for the officer to have inferred that the defendant may have been intoxicated). We overrule this portion of Rhodes's first issue.

Having determined that the trial court correctly made the determination that Walker possessed reasonable suspicion to stop and detain Rhodes for suspicion of DWI and that the trial court's conclusion of law is supported by the record, we must uphold the trial court's ruling to deny Rhodes's motion to suppress and we need not address the remainder of her first issue nor her second issue at all.

14

See *Stevens*, 235 S.W.3d at 740; *Armendariz*, 123 S.W.3d at 404; *see also State v. Plambeck*, 182 S.W.3d 365, 367 (Tex. Crim. App. 2005) (en banc) ("A court is not required to address issues that become moot because of the resolution of other issues.").

## IV. CONCLUSION

Having overruled a portion of Rhodes's first issue and not needing to address the remainder of her issues, we affirm the trial court's judgment.

/s/ Bill Meier

BILL MEIER
JUSTICE

PANEL: WALKER, MEIER, and GABRIEL, JJ.

WALKER, J., concurs without opinion.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: February 5, 2015