

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-13-00393-CR

RASHAD AZMI ELQUTOB                                                      APPELLANT

V.

THE STATE OF TEXAS                                                            STATE

----------

FROM CRIMINAL DISTRICT COURT NO. 3 OF TARRANT COUNTY
TRIAL COURT NO. 1334940R

----------

## MEMORANDUM OPINION[1]

----------

Rashad Azmi Elqutob brings eight points challenging his convictions and respective ten- and five-year sentences for engaging in organized criminal activity and for theft by receiving stolen property valued at more than $200,000. *See* Tex. Penal Code Ann. § 31.03(b)(2) (West Supp. 2014). The majority of his points concern his contention that, because of the wording of the indictment, the

---

[1]*See* Tex. R. App. P. 47.4.

jury charge, or both, he was not actually convicted of any offense under the penal code.  In his final point, he argues that the trial court abused its discretion by excluding evidence of a witness's prior criminal history.  We affirm.

**Background**

The State initially charged appellant with three counts relating to his alleged participation in a scheme to buy and sell stolen cell phones.  However, the State later waived count one, trying appellant on only counts two and three, which the parties agreed to renumber to counts one and two.  The first count alleged that appellant,

> WITH THE INTENT TO ESTABLISH, MAINTAIN OR PARTICIPATE IN THE PROFITS OF A COMBINATION[,] . . . COMMITTED THEFT OVER $200,000 BY UNLAWFULLY APPROPRIATING, BY ACQUIRING OR OTHERWISE EXERCISING CONTROL OVER, PROPERTY OF THE VALUE OF MORE THAN TWO HUNDRED THOUSAND DOLLARS FROM THE OWNER OF THE PROPERTY WITH THE INTENT TO DEPRIVE THE OWNER OF THE PROPERTY; AND SAID DEFENDANT APPROPRIATED THE PROPERTY BELIEVING IT WAS STOLEN BY ANOTHER, PURSUANT TO ONE SCHEME AND CONTINUING COURSE OF CONDUCT THAT BEGAN ON OR ABOUT APRIL THE 7TH, 2009 AND CONTINUED UNTIL ON OR ABOUT OCTOBER THE 10TH, 2010 AND THE OWNER, QUANTITY, AND PROPERTY ARE LISTED BELOW:
>
> MIKE HOPKINS THE FOLLOWING QUANTITY AND TYPE OF CELL PHONES:
>
> [Listing 31 different types of cell phones with a different quantity of each]
>
> MONIQUE HEBERT-LOFGREN THE FOLLOWING QUANTITY AND TYPE OF CELL PHONES:
>
> [Listing 5 different types of cell phones in differing quantities]

2

MANUAL CANGAS THE FOLLOWING QUANTITY AND TYPE OF CELL PHONES:

50 BLACKBERRY BOLD

In the second count, the State alleged that appellant,

UNLAWFULLY APPROPRIATE[D], BY ACQUIRING OR OTHERWISE EXERCISING CONTROL OVER, PROPERTY OF THE VALUE OF MORE THAN TWO HUNDRED THOUSAND DOLLARS FROM THE OWNER OF THE PROPERTY WITH THE INTENT TO DEPRIVE THE OWNER OF THE PROPERTY; AND SAID DEFENDANT APPROPRIATED THE PROPERTY BELIEVING IT WAS STOLEN BY ANOTHER,

PURSUANT TO ONE SCHEME AND CONTINUING COURSE OF CONDUCT THAT BEGAN ON OR ABOUT APRIL THE 7TH, 2009 AND CONTINUED UNTIL ON OR ABOUT OCTOBER THE 10TH, 2010 AND THE OWNER, QUANTITY, AND PROPERTY ARE LISTED BELOW:

[Listing the same types, quantities and owners of cell phones as alleged in Count One].

The language in the jury charge tracked the language above from the indictment. The jury convicted appellant of both counts.

**Points on Appeal**

Seven of appellant's eight points are related to the State's word choice in the indictment and jury charge. They focus primarily on the variance between the language used in the indictment and charge to describe the theft offense (also the underlying offense for the engaging in organized criminal activity count)—whether appellant "appropriated the property *believing* it was stolen by another"—and the language used in the penal code definition of theft—providing

3

that appropriation of property is unlawful if, among other things, "the actor appropriates the property *knowing* it was stolen by another." *Id.* (emphasis added). Appellant contends that "knowing" and "believing" have different definitions; in other words, appellant argues that by convicting him of offenses alleging that he appropriated property he only "believed" was stolen, the jury did not convict him of any offense under the penal code.

**Whether Indictment Alleged An Offense**

In his first and second points, appellant contends that the indictment is void for using the word "believing" instead of "knowing" in alleging the offenses. The State contends that appellant failed to preserve any error related to the substance or form of the indictment because he did not object to the language used in the indictment in the trial court.

A defendant who does not object to defects of form or substance in an indictment before trial fails to preserve any complaint about such defects. *Teal v. State*, 230 S.W.3d 172, 176–77 (Tex. Crim. App. 2007). But an instrument that does not meet the constitutional requisites of an indictment fails to confer subject matter jurisdiction on the trial court; thus, a charging instrument that does not meet the constitutional definition of an indictment may be challenged for the first time on appeal. *Smith v. State*, 309 S.W.3d 10, 16–18 (Tex. Crim. App. 2010); *Teal*, 230 S.W.3d at 179. The State characterizes appellant's argument as a complaint that the indictment fails to allege a required element of theft under the penal code. *See Studer v. State*, 799 S.W.2d 263, 271–72 (Tex. Crim. App.

4

1990) (holding that a charging instrument may be an indictment as contemplated by the Texas constitution even if fails to charge each element of an offense).  But although appellant does state in his brief that because the indictment alleged an incorrect mental state, it "failed to allege an element of the offense of theft," he also contends that the indictment is void because it wholly fails to allege an offense.  *See Cook v. State*, 902 S.W.2d 471, 477 (Tex. Crim. App. 1995) (holding that a charging instrument must allege (1) a person and (2) the commission of an offense to be an indictment under the constitution).

The proper test to determine if a charging instrument alleges an offense is whether the allegations in it are clear and specific enough so that a person can identify the offense alleged, i.e., the penal statute under which the State intends to prosecute the defendant.  *Teal*, 230 S.W.3d at 180; *Duron v. State*, 956 S.W.2d 547, 550–51 (Tex. Crim. App. 1997).  If the allegations are sufficiently clear and specific, the indictment is sufficient to confer subject matter jurisdiction. *Teal*, 230 S.W.3d at 180.  "Stated another way:  Can the trial court (and appellate courts who give deference to the trial court's assessment) and the defendant identify what penal code provision is alleged and is that penal code provision one that vests jurisdiction in the trial court?"  *Id.*

Section 31.03 of the penal code provides that (1) "[a] person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property," (2) that "[a]ppropriation of property is unlawful if . . . the property is stolen and the actor appropriates the property knowing it was stolen by another,"

5

and (3) that such an offense is "a felony of the first degree if the value of the property stolen is $200,000 or more." Tex. Penal Code Ann. § 31.03(a), (b)(2), (e)(7). Comparing the wording of this statute and the wording of the two counts in the indictment, we conclude that—regardless of how appellant has characterized his argument—he is essentially complaining that the indictment used an incorrect word to describe the mens rea of the alleged offenses. One can discern from the wording of the indictment that the State is alleging in both counts that (1) appellant (2) with the intent to deprive the complainants of cell phones (3) unlawfully appropriated those cell phones (4) which were valued at more than $200,000 and (5) that he thought another person had stolen the cell phones. The code of criminal procedure, like the Texas Constitution, does not require an indictment to directly track the wording used in the penal code to describe an offense. *See* Tex. Code Crim. Proc. Ann. art. 21.17 (West 2009) ("Words used in a statute to define an offense need not be strictly pursued in the indictment; it is sufficient to use other words conveying the same meaning, or which include the sense of the statutory words."). We conclude and hold that the indictment—by alleging that appellant unlawfully appropriated property he believed to be stolen—was sufficiently clear and specific to allege the offenses in counts one and two. Thus, the indictment is not constitutionally defective such that appellant was relieved of the responsibility to object to its use of the word "believing" rather than "knowing," and appellant's complaint about the wording of

6

the indictment was not preserved for appeal. We overrule appellant's first and second points.

**Whether Material Variance Renders Conviction Infirm**

In his sixth point, appellant contends that there is a fatal variance between the language of the indictment, the jury charge, and the statute; thus, according to appellant, the evidence is insufficient to support his convictions. However, rather than explaining why the evidence adduced at trial does not support the convictions under a hypothetically correct jury charge, appellant argues that the evidence is insufficient "because the hypothetically correct jury charge is not supported by the indictment." This is not the standard of review that we must follow.

To determine whether the State has met its burden under *Jackson v. Virginia* to prove a defendant guilty beyond a reasonable doubt, we compare the elements of the crime as defined by the hypothetically correct jury charge to the evidence adduced at trial. *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014). A hypothetically correct jury charge is one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.* (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). The law as authorized by the indictment consists of the statutory elements of the offense and those elements as modified by the indictment. *Id.*

7

There are two types of variances in an evidentiary-sufficiency analysis: material variances and immaterial variances. *Id.* at 9. Immaterial variances do not affect the validity of a criminal conviction; thus, a hypothetically correct jury charge need not incorporate allegations that would give rise to only immaterial variances. *Id.* But a material variance renders a conviction infirm, and the only remedy is to render an acquittal. *Id.*

Here, a hypothetically correct charge would have asked the jury in both counts whether appellant unlawfully appropriated property "knowing" it was stolen by another. *See* Tex. Penal Code Ann. § 31.03(b)(2). Appellant contends that by charging him with unlawfully appropriating stolen property "believing" it was stolen by another, the indictment modified the hypothetically correct jury charge to change the mens rea of the offenses so that the State had to prove appellant committed the offense of theft as set forth in section 31.03(b)(3) of the penal code, which provides that appropriation of property is unlawful if "property in the custody of any law enforcement agency was explicitly represented by any law enforcement agent to the actor as being stolen and the actor appropriates the property believing it was stolen by another." *Id.* § 31.03(b)(3). Although we agree that the evidence does not support convictions for theft as defined in penal code section 31.03(b)(3)[2] or engaging in organized criminal activity based on the same theft offense, we do not agree that the evidence is insufficient to support

[2]As appellant states in his brief, "As the record demonstrates the facts alleged, offense charged, and jury charge do not fit in this category."

8

his convictions based on the definition of theft in penal code section 31.03(b)(2), according to the hypothetically correct jury charge as further defined by the indictment.

The penal code provides that "[a] person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist." *Id.* § 6.03(b) (West 2011). "Believe" has been defined as "to accept as the truth; to take as true, real"; or "to have confidence in a promise or statement of (another person)." *Flowers v. State*, 890 S.W.2d 906, 916 (Tex. App.—El Paso 1994, no pet.) (quoting Webster's New Universal Unabridged Dictionary 169 (1983)); *see also* Tex. Gov't Code Ann. § 311.011(a) (West 2013) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage."); Black's Law Dictionary 184 (10th ed. 2014) (defining "believe" as "[t]o feel certain about the truth of").

The Court of Criminal Appeals has held in an indictment-sufficiency case that "[t]he word 'knowingly,' as used in the context that a defendant knowingly receives property that has been stolen, requires actual subjective knowledge, rather than knowledge that would have indicated to a reasonably prudent man that the property was stolen." *Dennis v. State*, 647 S.W.2d 275, 280 (Tex. Crim. App. 1983). But the Court of Criminal Appeals has also held that "[k]nowledge that property was stolen can be shown by circumstantial evidence." *Chudleigh v. State*, 540 S.W.2d 314, 317 (Tex. Crim. App. 1976).

In construing the meaning of the word "know" as used in sections 22.011(b)(3) or (5) of the Penal Code, the First Court of Appeals discussed section 31.03(b)(3) and held that the ordinary meaning of the word "know"—as opposed to the statutory definition of "knowingly"—includes what is subjectively true but also what the actor subjectively "believes" to be true but is untrue. *See Jiminez v. State*, 727 S.W.2d 789, 792–93 (Tex. App.—Houston [1st Dist.] 1987, pet. ref'd). Thus, a person can believe something to be true when it is not true, but a person can also believe something to be true because it is true. Contrary to appellant's contention, then, the use of the word "believes" in the indictment did not necessarily limit the jury to considering only whether appellant "possessed knowledge that would have indicated to a reasonably prudent man that the property was stolen"—in other words, that he believed the phones to be stolen but they were not—rather than, also, whether appellant subjectively believed the cell phones were stolen because they actually were.

Appellant contends that the only evidence that could possibly support that he knew the cell phones were actually stolen is testimony from J.A., an employee at a Radio Shack kiosk in a Sam's Club.[3] J.A. testified that he stole new Sprint

---

[3]Appellant states in his brief: "One of the more important State's witnesses was J.A. (5 R.R. at 180). Mr. J.A. is the only person who testified that he communicated with Appellant about cell phones and that Appellant had any knowledge that any cell phones were stolen; thus, his testimony was vital to this case." We will use initials to refer to the witness as appellant did in his brief.

cell phones[4] intended for a free-phone sales promotion by falsely indicating in the business's inventory system that the phones had been given to a customer as part of the promotion when he had instead appropriated them. One day, J.A. took several of the stolen BlackBerrys in new packaging to a gas station in Arlington. He offered to sell the cell phones to several people; some declined, but appellant agreed to buy them.[5] Over the next month or so, appellant bought twenty or thirty cell phones from J.A. at the same gas station, meeting him between ten and fifteen times.[6] J.A. did not tell appellant the phones were stolen, but at some point, he told appellant that he was getting the phones from work.[7]

Eventually, appellant asked J.A. to get him a different, more expensive model of phone, and J.A. did so. Also, appellant introduced J.A. to his father and told J.A. that his father would be buying the phones from now on. J.A. sold between four to eight phones at a time to appellant's father. Appellant and his father both paid cash for the phones and were able to negotiate a lower price for the phones from J.A. J.A. testified about when the police finally questioned him;

---

[4]Even on cross-examination, J.A. testified unequivocally that he had stolen the cell phones.

[5]Specifically, J.A. told appellant, "I got some BlackBerr[y]s for cheap."

[6]J.A. testified that appellant told him, "If you keep them coming, I can keep on buying them."

[7]J.A. had to tell appellant about where he was getting the phones because appellant had started to complain that some of the phones had been locked.

11

he told them, "how [he] met [appellant] and sold him a few phones, and how [J.A.] was stealing them and . . . was getting them out [of] the system through Sprint mainly."

J.A. explained that he stole the phones by either adding them to an existing customer's phone line without that customer's permission or by creating a new phone line specifically for that phone. After he added the phone to a line, however, he would change the phone's ESN[8] in the Sprint computer system so that the ESN would no longer be associated with a phone line. According to J.A., a phone reported stolen or attributed to an existing account for too long without being used is put on a "hot list," and the phone is locked.[9] According to J.A., both appellant and his father had complained to him that some of the phones they sold to other people were unusable because they were on a hot list, and they asked J.A. to fix the problem. This occurred a few times when J.A. had forgotten to switch the ESN in the system after adding a phone to a line. At the request of appellant or his father, J.A. would remove the hot listed phone's ESN from the existing phone line, so that it would no longer show up on the hot list. J.A. told both appellant and his father that he would fix the hot list problem with

---

[8]ESN stands for electronic serial number. Each phone is assigned an ESN that is assigned only to that phone and "should never change."

[9]One witness testified that if a cell phone is reported to a provider as being stolen or lost, it cannot then be activated on that company's network. She further testified that in 2009, the hot list was available to businesses but not the general public.

12

those phones by "get[ting] them out [of] the system." According to J.A., "Once they [referring to appellant and his father] couldn't use them, they knew [the phones] had a phone number on them." J.A. had also told appellant's father to sell the phones quickly so that they would not end up on the hot list. J.A. said that appellant and his father bought four more phones "right after" complaining about other phones J.A. sold them being on the hot list. An investigator who interviewed J.A. about the stolen phones read part of J.A.'s second statement to law enforcement: "I met his son [appellant] like two months before I met him. It was in July. I sold him two phones -- the first two phones. I sold him like 15 more until he finally said, 'They caught my dad.'"

According to appellant, the jury could only reasonably have inferred from J.A.'s testimony that a reasonable person would have believed that the phones were stolen, not that appellant had actual, subjective knowledge that the phones J.A. was selling him were stolen. However, the jury could have reasonably inferred from other circumstantial evidence in the record that appellant subjectively knew the phones were stolen, in other words, that he believed the phones were stolen and that they actually were stolen. *See, e.g.*, *Chudleigh*, 540 S.W.2d at 317.

Geoff Neimeth, the former director of security and loss prevention for ATC Logistics & Electronics, a cell phone distributor for AT&T, testified about his 2009 investigation into missing, new BlackBerry Bold devices at the ATC facility. According to Neimeth, ATC discovered that over 450 phones that had been

13

logged in as arriving at the facility could not be accounted for. After a thorough investigation, Neimeth concluded that the phones had been stolen although he was never able to identify the method by which they were stolen or the person who took them from the facility. The phones were discovered to be missing in increments after periodic inventory counts: 19 on March 11, 2009, another 239 on April 7, 2009, another 102 on April 28, 2009, and, finally, another 101 on May 6, 2009. He found at least one of the phones in use, which indicated to him that it, like the rest of the phones, had been stolen from the facility.

Neimeth searched for sellers of BlackBerry Bold devices and discovered that appellant was advertising unlocked BlackBerry Bold phones on eBay and Craigslist. Neimeth explained that when a phone is unlocked, it will work on any carrier's network for which it is compatible, not just the carrier from whom the consumer bought the phone. Neimeth also opined that there is no reason a legitimate seller of a brand-new, in-the-box cell phone would offer it for sale unlocked. However, he also admitted on cross-examination that a phone is not necessarily stolen if it is unlocked.

Manuel Cangas, the security manager for ATC, reported to Neimeth and assisted with the investigation of the missing phones from ATC's facility. Cangas used a list of the missing phones' serial numbers to search whether any of them had been activated on a cell provider's network. Cangas was able to contact one of the phone users, who had bought his phone from Reemsales, a company run by appellant. Cangas was also able to determine that appellant's SIM card had

14

been activated in at least two of the missing phones.[10]  Finally, ATC was able to locate at least six people who had purchased a missing ATC phone from appellant.

The evidence showed that appellant was an AT&T employee and that he maintained a cell site for AT&T as a technician.  Juan Wallace, a former AT&T loss prevention investigator, was assigned to investigate the complaint regarding the BlackBerry devices missing from ATC.  Because some of the missing devices showed evidence of activation with a company-owned AT&T device, Wallace focused his investigation on "competitive employment and misuse of company property."  Wallace discovered that appellant had been assigned five company-owned AT&T devices—including a laptop and BlackBerry—and that he had two personal employee cell phone numbers with AT&T.  Wallace then ran a report on each of the devices and phone numbers; between May 2005 and 2009, he found over 1,122 activations on the SIM cards for the company-owned devices issued to appellant:  564 on the "UMTS Voice" device's card, 135 on the scanner's card, 240 on the BlackBerry's card, 54 on the "Device Testing" unit's card, and 129 on the laptop's card.  According to Wallace, "That's the most activations I've ever

---

[10]Cangas explained that when you take a SIM card out of one cell phone, and place it in another, the phone in which the card is placed records the card as an activation.  In other words, placing a SIM card in any phone creates a "trail" in that particular phone showing that the SIM card was at one time placed there.  The cell phone providers can trace these activations on any of their phones.

seen on any one SIM card."[11]  Wallace further found 63 activations on a SIM card associated with one of appellant's personal AT&T phone numbers, and 34 activations on the other.  Wallace interviewed appellant about the missing phones in December 2009.

Ralph Wilson, appellant's supervisor at AT&T, testified that several different company devices were assigned to appellant.  Wilson explained that appellant was part of a special team of employees who tested new AT&T devices; however, he also said that someone in appellant's job would have no need to be switching SIM cards between five and six times a day.  Wilson said that appellant called him before the interview with Wallace in December 2009 and asked for Wilson's spare computer, but appellant was not able to get it before Wilson and appellant were called to AT&T headquarters for the interview. According to Wilson, appellant was quiet during the interview, seemed "somewhat nervous," and would not answer all the questions Wallace asked. Wilson confirmed that appellant asked Wallace during the interview, "If I . . . submit my resignation, will this end this discussion?"  Wallace confirmed that appellant did resign during the interview after Wallace asked him where he got two BlackBerrys he had activated and sold that were missing from ATC. Appellant told Wallace that he believed he had paid about $400 for each from an unknown seller on Craigslist.

---

[11]It is difficult to tell from the questioning whether Wallace was referring to the 564 activations or the collective total of activations from all of the devices.

Monique Hebert-Lofgren, a loss prevention manager for Radio Shack, testified that she started an investigation in September 2009 involving "unauthorized lines being added to people's accounts." Sprint notified Radio Shack of some suspicious deactivations of accounts; Radio Shack ran the ESNs for those phones in their system to see when they were added into the register at the time of sale. She was able to trace the activations and deactivations to two employees, one of whom was J.A. Radio Shack was able to compile a list of the phones it believed had been stolen by these employees; that list was admitted at trial. All of Radio Shack's phones have unique stickers on them identifying them as Radio Shack phones.

K.P., a former worker at New Breed, a Verizon phone refurbisher, testified about how she stole phones from the facility where she worked. She said she would meet appellant and his father at an El Chico restaurant and would sell them the phones she had stolen. Sometimes she would sell thirty or forty phones at a time.[12] She thought that the first time she sold about thirty-five phones to appellant and his father together, and they paid her $1,000. She typically sold them each phone for "30, 40, or 60," and they paid her in cash. After the first meeting, she only met with appellant's father. They only bought new phones from her, which she packaged in a shoebox or noodle box. K.P. told appellant and his father she got the phones from other people.

---

[12]The evidence showed that she stole over 700 phones.

17

K.P.'s daughter, who accompanied her mother to the meetings, testified that she did not know the phones her mother was selling were stolen. After the first meeting, though, appellant asked K.P. if she could get more phones "in bulks." K.P.'s daughter then became suspicious after her mother started getting more and more phones in bulk.

An investigator for the Tarrant County District Attorney's office's economic crimes unit testified about how law enforcement was able to link the email address appellant used for his eBay and Craigslist advertisements to two companies, Reemsales and Deal Maker, and to two Wells Fargo accounts associated with appellant. The investigator also assisted in executing a search of appellant's father's home in December 2009 in connection with the investigation of appellant. The investigator said that the home's front office had boxes full of cell phones and that officers found over 1,000 phones there that day. The officers also found mail addressed to appellant and six checkbooks for Deal Maker. Although officers did not find any of the Radio Shack phones at the house, they did find 117 of the missing ATC phones and about 800 of the Verizon phones that K.P. had stolen; the Verizon phones had stickers on them specific to the New Breed facility. Authorities also found $20,251 in cash at the home with a purple sticker on it that said "Rashad." Officers further seized a notebook with handwritten lists of phones along with the phones' serial numbers.

They discovered after analyzing the notebook that the IMEI numbers[13] for 115 ATC phones and 49 New Breed phones were listed in the notebook.

At appellant's residence, which officers searched the same day as his father's home, officers seized numerous phones throughout the house. They found more checkbooks and other records for Deal Maker as well as numerous SIM cards and appellant's AT&T-issued equipment. Officers also found a notebook with phone serial numbers listed in it; the handwriting in the notebook appears to match that in the notebook found in Arlington. Investigators found three stolen phones at appellant's residence: an AT&T phone from the ATC facility, one Radio Shack phone, and one of the Verizon phones from the New Breed facility. The State also introduced evidence that the SIM cards for all five of appellant's AT&T-issued devices had been placed into each of the phones they found at his house and that it had to have been done "[q]uite often."

Investigators also found flash boxes at appellant's home. Flash boxes are used for unlocking phones: "Basically, you use these to unlock phones so they can be used by other carriers. At that time if you were pretty much locked into contracts with whatever cell phone company you had, if you had one of these, you could free up your phone to be used on another network." When asked if there was "any legitimate reason to have those if you're a legitimate reseller of

---

[13]An IMEI number is another type of number unique to a particular cell phone.

19

brand new phones," a Secret Service agent who participated in the investigation answered, "No."

In reviewing the business records for Deal Maker, investigators found no receipts for purchases of phones from March 19 when phones were first discovered missing at ATC through April 23 when one of those phones was sold on Craigslist. However, they did find receipts for purchases of many accessories compatible with those types of phones.

Carl Allen, a former Verizon employee, examined the data from some of the phones seized pursuant to the warrants. The trial court admitted evidence of data from some of the phones seized from appellant's house. One of the text messages read, "Please sell the bad ESN phones for whatever you can get for them, and I will take care of you on the rest." A text exchange between one of appellant's numbers and his father's number reads as follows: "Okay, text me or the bad ESN -- for the bad ESN numbers. . . . He will take care of it if they are three only. . . . I need a list of the IMEI numbers for the phones that you need unlocked. Try to unlock them all first, please, and then if it does not work, just get me the IMEI numbers."

Appellant changed his email address after law enforcement searched his and his father's homes and began selling phones under the name Wireless World Warehouse. The evidence showed that although the volume of sales through appellant's entities decreased in December 2009, he was still making

sales until October 2010, when law enforcement searched his home a second time.

Appellant admitted that he was the owner of Deal Maker. However, appellant also testified that his father was running the cell phone business by himself by the end of 2008.[14] Although there is evidence that appellant's father was involved in many of the actual purchases of the phones from J.A. and K.P., there was sufficient evidence linking both appellant and his father to the businesses through which appellant sold the phones on Craigslist and eBay, including Deal Maker and Reemsales.

Appellant disclaimed any knowledge that the phones he had sold were stolen. He agreed that he had run into a problem with a phone being hot listed and had therefore developed a procedure for checking whether a phone was on a hot list before buying it:

> In the cell phone business you got two types of phones. You have CDMA, which is covered by Verizon, Sprint, MetroPCS, and then you got GSM. That's covered by AT&T, T-Mobile, any company that takes a SIM card.
>
> . . . .
>
> . . . On CDMA phones there is now three things I check before I buy them. I call the company. I ask them if the phone has ever been reported lost or stolen. I asked the phone, if it's been

---

[14]The State introduced evidence that appellant paid his father a salary and that his father was listed as a contract worker on appellant's tax return for 2009. Appellant testified that his father's trusting and "hardheaded" nature caused his father to lose a gas station business, which is why appellant handed over the cell phone business to him.

blacklisted. And then the new key question that I never asked before, if the phone has ever been activated on an account and deactivated, which at that time is what those people did.

Appellant also testified that he had trained his father in these procedures and could not understand why his father would not have followed them except that he was "hardheaded."

According to appellant, J.A. called him first; appellant assumed J.A. got his number from Craigslist. Appellant said he checked out the phones he bought from J.A. at a Sprint store before buying them. However, appellant testified that he met with J.A. only three times and bought only six phones. Appellant testified that he knew Sprint was running an upgrade special and that he bought phones from lots of customers who were upgrading their phones so they could sell them. He admitted he bought phones from K.P.'s daughter but said she told him she had bought the phones from other sellers. Appellant denied ever meeting K.P.

Based on the above, we conclude and hold that there is sufficient evidence other than appellant's mere possession of stolen property from which the jury could have reasonably determined that appellant committed theft by receiving property that (a) was actually stolen and (b) he subjectively knew was stolen. *See, e.g.*, *Chudleigh*, 540 S.W.2d at 317; *Pollan v. State*, 247 S.W.2d 889, 891– 92 (Tex. Crim. App. 1952) (op. on reh'g); *Hart v. State*, No. 05-08-01225-CR, 2010 WL 851405, at *5 (Tex. App.—Dallas Feb. 26, 2010, pet. ref'd) (not designated for publication). We overrule appellant's sixth point. Because his

22

seventh point alleges that the trial court should have granted him a new trial for the same reason raised in his sixth point, we overrule his seventh point as well.

**Whether Charge Error Harmful**

In his third through fifth points, appellant contends that the charge, by tracking the language of the indictment, improperly instructed the jury, causing the jury to convict him of behavior that does not constitute an offense. Thus, his third through fifth points are based on the same arguments he raises in his first, second, sixth, and seventh points.

The State conceded in its response to appellant's motion for new trial that the use of the word "believing" in the jury charge was error. However, because appellant failed to object to the wording of the charge at trial, we must review the entire record to determine whether the error caused appellant egregious harm. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see* Tex. Code Crim. Proc. Ann. art. 36.19 (West 2006). Here, the court reporter did not record closing argument or voir dire;[15] thus, we look to the clerk's record and the recorded parts of the trial and any pretrial proceedings.

Errors that result in egregious harm are those "that affect the very basis of the case, deprive the defendant of a valuable right, vitally affect the defensive

---

[15]It is unclear from the court reporter's notes whether the parties agreed not to have these parts of the trial recorded. Nevertheless, appellant has not raised the lack of their recording as error.

23

theory, or make a case for conviction clearly and significantly more persuasive." *Taylor v. State*, 332 S.W.3d 483, 490 (Tex. Crim. App. 2011). The purpose of this review is to illuminate the actual, not just theoretical, harm to the accused. *Almanza*, 686 S.W.2d at 174.

Appellant's main argument is that by using the word believing rather than knowing, the charge lessened the State's burden of proof: "The heart of Appellant's defense was [that he was] not guilty of a theft because he did not know the cell phones were stolen." We have explained why the evidence shows that appellant was not convicted on a lesser burden of proof. Moreover, in reviewing the entire record for evidence of harm, we note that the clerk's record contains numerous *Brady* notices to appellant's trial counsel from the State, many of which relate to evidence suggesting that appellant did not know the phones he was selling were stolen. Thus, pretrial filings indicate that appellant's knowledge or lack thereof would be an issue in the trial. Additionally, the State attached to its motion for new trial copies of Power Point slides it presented to the jury during its closing argument, several of which reiterated, "he knew," with references to evidence of appellant's knowledge that the phones were stolen, such as that he was buying new-in-the-box phones with specific identifying provider stickers on them for substantially less than what appellant had paid for new phones from other sellers.

Our review of the appellate record indicates that appellant was not deprived of a valuable right or the ability to present a defensive theory by virtue

of the error in the charge: appellant's counsel emphasized during trial the extent of appellant's father's participation in buying the phones, and appellant's own testimony was mainly focused on his contention that he did not know the phones were stolen. Indeed, the State contends in its motion for new trial that appellant's counsel knew of the jury charge error, allowed it to stand, and pressured the State to make a misdemeanor plea offer because of the error while the jury was deliberating. We conclude and hold that the record does not show egregious harm because of the inclusion of the word "believing" instead of "knowing" in the charge. We overrule appellant's third through fifth points.

**Whether Impeachment Evidence Improperly Excluded**

In his eighth point, appellant challenges the trial court's ruling that he could not ask J.A. about a past misdemeanor conviction for marijuana possession. Although appellant acknowledges that rule of evidence 608(b) generally prohibits use of a misdemeanor conviction to impeach a witness's credibility, he urges that the trial court should have nevertheless allowed him to ask the question because he proved an exception to rule 608(b)'s general prohibition: that J.A. opened the door to questioning about his conviction by leaving a false impression about the extent of his prior criminal history. Tex. R. Evid. 608(b); *see West v. State*, 169 S.W.3d 275, 278 (Tex. App.—Fort Worth 2005, pet. ref'd).

The following exchange occurred at the beginning of the State's direct examination of J.A.:

Q. [J.A.], will you state your name for the jury.

. . . .

Q. [A]re you currently employed?

A. Not anymore.

Q. Have you been charged with a crime? Let's start with that.

A. Any crime?

Q. *This phone stealing engaging in organized crime case.*

A. No, ma'am.

Q. *In this case* you've been charged with a crime, right?

A. Okay, convicted. I'm sorry.

Q. You're not convicted. Charged?

A. Charged, yes. Yes, ma'am. Sorry.

Q. *And is that case still pending?*

A. Yes, ma'am.

Q. And, in fact, you had court this week, right?

A. Yes. [Emphasis added.]

Appellant claims that this exchange opened the door to an examination of J.A.'s entire past criminal history. Here, however, the context of the exchange is limited to whether J.A. was facing charges for stealing the Radio Shack phones, and neither the State's questions nor J.A.'s testimony that he had not yet been convicted or charged creates a false impression that he had a past history of law-abiding behavior. *See Hammett v. State*, 713 S.W.2d 102, 106–07 (Tex. Crim. App. 1986) (examining context of questioning and testimony to determine

26

whether false impression of past law-abiding behavior given); *James v. State*, 102 S.W.3d 162, 181 (Tex. App.—Fort Worth 2003, pet. ref'd) ("[T]he 'false impression' exception is given a narrow construction by the case law. . . . In order to open the door to use of prior crimes for impeachment, the witness must do more than simply imply that he abides by the law; he must in some way convey the impression that he has never committed a crime." (citation omitted)). Accordingly, we conclude and hold that the trial court did not abuse its discretion by prohibiting appellant from inquiring into J.A.'s past misdemeanor conviction. We overrule appellant's eighth point.

## Conclusion

Having overruled appellant's eight points, we affirm the trial court's judgments.

/s/ Terrie Livingston

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and MEIER, JJ.

DAUPHINOT, J., concurs without opinion.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  April 9, 2015